SEALED

FILED BY _____ D.C.

AUG 12 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.                                                    **Filed Under Seal**

WELLS REAL ESTATE INVESTMENT, LLC,
JANALIE C. JOSEPH A/K/A JANALIE C. BINGHAM,
and JEAN JOSEPH,
                Defendants, and

CAMBRIDGE REAL ESTATE MANAGEMENT, LLC,
60 YACHT CLUB, LLC,
112 SOUTH OLIVE, LLC,
791 PARKSIDE HOME, LLC,
910 PARKSIDE, LLC,
930 PARKSIDE, LLC,
976 PALM BEACH SQUARE, LLC,
1070 BOCA RATON SQUARE, LLC,
2082 PARADISE PALM, LLC,
2295 CORPORATE BLVD LLC,
4050 NW, LLC,
4100 HOSPITAL OFFICE, LLC,
4800 FEDERAL, LLC,
7352 VALENCIA, LLC,
7483 VALENCIA, LLC,
BOCA DEERFIELD PROPERTIES, LLC,
DAYBREAK HOME, LLC,
GLOBE OFFICES, LLC,
GLOBE PROPERTY OFFICES, LLC,
LW SQUARE OFFICE, LLC,
MARTINIQUEÂ INVESTMENTS LLC
        a/k/a MARTINIQUE'S INVESTMENTS LLC,
OAKLAND LAND PROPERTY, LLC, and
SOUTH OLIVE OFFICE, LLC,

                Relief Defendants.
_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

1

## I.     INTRODUCTION

1.     The Commission brings this action to prevent further dissipation and misappropriation of investor assets by Defendants Wells Real Estate Investment, LLC ("Wells"), its Chief Executive Officer ("CEO"), Janalie C. Joseph a/k/a Janalie C. Bingham ("Bingham"), and undisclosed control person and previously convicted felon Jean Joseph ("Joseph"; collectively, "Defendants"), who have violated the antifraud and other sections of the federal securities laws. From at least January 2020 to at least May 2024 (the "Relevant Period"), Defendants have raised at least $56 million from at least 660 investors nationwide through a fraudulent offering of promissory notes, misrepresenting, among other things, that Wells has a $450 million real estate portfolio and only uses investor funds to invest in, and improve, real estate.

2.     Using a network of unregistered agents—both in-house and independent agents nationwide—Defendants solicit investors to invest in, among others, Wells' "Assets-to-Income Program," offering promissory notes that pay interest ranging from approximately 12% annually for 18 or 28-month notes, or 99% at the end of 36-month notes (the "Note(s)"). Through Wells' website, in marketing presentations to investors, and offering materials, Defendants assure investors that their funds will be used to "acquire, develop, and revitalize" residential and commercial properties primarily in South Florida, and that their investments are "collateralized" and "secured" by real estate assets. Defendants also tout Bingham's bona fides as "an accomplished real estate investor" who has a built her own real estate portfolio worth over $100 million.

3.     In reality, it appears only about $11 million of the $56 million of investor funds raised were actually used to purchase real properties, which were acquired and managed through twenty-three affiliated limited liability companies controlled by Defendants (collectively, "Relief

Defendants").[1] The properties were valued at approximately $46 million at acquisition, are heavily financed through mortgages, and generate insufficient income to pay the debt financing, operating expenses, and promised interest to investors.

4.      In addition, Defendants have misused and misappropriated millions of investor funds. Bingham and Joseph transferred approximately $28 million of investor funds to brokerage firms, where they engaged in highly speculative futures and options trading, losing at least $11.9 million. Defendants have also used approximately $6.9 million to pay undisclosed commissions to sales agents and, in a Ponzi-like fashion, used investor funds to make interest and principal payments to other investors. Bingham and Joseph have also misappropriated approximately $1.8 million for personal expenses, and have transferred the title of a $1.9 million house from Relief Defendant 930 Parkside to Bingham. None of these material facts were disclosed to investors. Nor did Defendants disclose the fact that Wells is co-managed by the CEO's husband, Joseph, who is a felon on Court ordered supervision.

5.      By engaging in the conduct alleged in this Complaint, Defendants Wells, Bingham and Joseph violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act of 1934 ("Exchange Act" ) [15 U.S.C. § 78j(b)], and

---

[1] Relief Defendants are Cambridge Real Estate Management, LLC ("Cambridge"), 60 Yacht Club, LLC ("60 Yacht Club"), 112 South Olive, LLC ("112 South Olive"), 791 Parkside Home, LLC ("791 Parkside"), 910 Parkside, LLC ("910 Parkside"), 930 Parkside, LLC ("930 Parkside"), 976 Palm Beach Square, LLC ("976 Palm Beach Square"), 1070 Boca Raton Square, LLC ("1070 Boca Square"), 2082 Paradise Palm, LLC ("2082 Paradise"), 2295 Corporate Blvd LLC ("2295 Corporate Blvd"), 4050 NW, LLC ("4050 NW"), 4100 Hospital Office, LLC ("4100 Hospital"), 4800 Federal, LLC ("4800 Federal"), 7352 Valencia, LLC ("7352 Valencia"), 7483 Valencia, LLC ("7483 Valencia"), Boca Deerfield Properties, LLC ("Boca Deerfield Properties"), Daybreak Home, LLC ("Daybreak Home"), Globe Offices, LLC ("Globe Offices"), Globe Property Offices, LLC ("Globe Property"), LW Square Office, LLC ("LW Square"), Martiniqueâ Investments LLC a/k/a Martinique's Investments LLC ("Martinique Investments"), Oakland Land Property, LLC ("Oakland Land"), and South Olive Office, LLC ("South Olive").

Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]. Further, Defendants Bingham and Joseph, directly and indirectly, violated Exchange Act Section 10(b) and Rule 10b-5 as control persons of Wells under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

6.      Among other relief, the Commission seeks permanent injunctions, disgorgement of ill-gotten gains with prejudgment interest, and civil monetary penalties against the Defendants. The Commission also seeks an order against Bingham and Joseph imposing an officer and director bar. To protect investors and preserve investor assets, the Commission also seeks emergency relief, including asset freezes, the appointment of a receiver, an order prohibiting the destruction of documents, and sworn accountings.

## II.      DEFENDANTS AND RELIEF DEFENDANTS

### A.      Defendants

7.      **Wells** is a Wyoming limited liability company formed in 2017 with its principal place of business in West Palm Beach, Florida. Wells acquires, sells, borrows against, and manages commercial and residential real estate, including through the Relief Defendants. Additionally, Bingham opened multiple online brokerage accounts in Wells' name, and investor funds were transferred to those accounts for speculative trading.

8.      **Bingham** resides in Boca Raton, Florida. According to documents provided to investors, Bingham is Wells' founder and CEO and controls 100% of Wells' equity membership interest. Bingham is married to Defendant Joseph, and together they maintain operational control over Wells and Relief Defendants. Bingham has sole signatory authority over all of Wells' and Relief Defendants' bank and brokerage accounts. Bingham has never held any securities licenses or been associated with any entity registered with the Commission.

4

9.      **Joseph** resides in or near Boca Raton, Florida.  Joseph is the former manager of Evergreen United Investments, LLC ("Evergreen").  In April 2019, Joseph and Evergreen were indicted by the U.S. Attorney's Office for the Southern District of Florida for one count of wire fraud in violation of Title 18, United States Code, Section 1343.  *See U.S. v. Joseph*, S.D. Fla. Case No. 19-20177-CR.  Joseph pled guilty in November 2019 to one count of wire fraud, was sentenced to 15 months in prison, and was ordered to pay approximately $3 million in restitution.  Joseph was released from prison in 2021 and placed on three years of supervised release.  Based on July 2024 filings in Joseph's criminal case, a supervised release revocation proceeding was commenced against Joseph, all of his supervised release conditions were incorporated, and Joseph stipulated to a $25,000 bond.  During the Relevant Period, Joseph did not hold any securities licenses, nor was he associated with any entity registered with the Commission.

**B.      Relief Defendants**

10.     **Cambridge** is a Florida limited liability company, claiming to have a current principal place of business in Las Vegas, Nevada.  Wells is its authorized member.  Cambridge manages properties owned by Wells and its affiliates.  Bingham opened multiple online brokerage accounts in Cambridge's name, and investor funds were transferred to those accounts for speculative trading.

11.     **60 Yacht Club** is a Florida limited liability company formed in May 2021, claiming to have a current principal place of business in Las Vegas, Nevada.  Wells is its authorized member.  Bingham opened multiple online brokerage accounts in 60 Yacht Club's name, and investor funds were transferred to those accounts for speculative trading.

12.     **112 South Olive** is a Florida limited liability company formed in August 2022, claiming to have its principal place of business in Las Vegas, Nevada. Wells is its authorized member.

13.     **791 Parkside Home** is a Florida limited liability company formed in July 2021, claiming to have its principal place of business in Las Vegas, Nevada. Wells is its authorized member.

14.     **910 Parkside** is a Florida limited liability company formed in August 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

15.     **930 Parkside** is a Florida limited liability company formed in August 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

16.     **976 Palm Beach Square** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming. Wells is its authorized member.

17.     **1070 Boca Raton Square** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming. Wells is its authorized member. Bingham opened multiple online brokerage accounts in 1070 Boca Raton Square's name, and investor funds were transferred to those accounts for speculative trading.

18.     **2082 Paradise Palm** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming. Wells is its authorized member.

19.     **2295 Corporate Blvd** is a Florida limited liability company formed in December 2022, claiming to have a current principal place of business in Las Vegas, Nevada.  Wells is its authorized member.

20.     **4050 NW** is a Florida limited liability company formed in December 2022, claiming to have a current principal place of business in Las Vegas, Nevada.  Wells is its authorized member.

21.     **4100 Hospital Office** is a Florida limited liability company formed in March 2019, with its principal place of business in West Palm Beach, Florida.  Wells is its manager and Bingham is its registered agent.

22.     **4800 Federal** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.  Bingham opened multiple online brokerage accounts in 4800 Federal's name, and investor funds were transferred to those accounts for speculative trading.

23.     **7352 Valencia** is a Florida limited liability company formed in June 2022, claiming to have a current principal place of business in Las Vegas, Nevada.  Wells is its authorized member.

24.     **7483 Valencia** is a Florida limited liability company formed in May 2022, claiming to have a current principal place of business in Las Vegas, Nevada.  Wells is its authorized member.

25.     **Boca Deerfield Properties** is a Florida limited liability company formed in September 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

26.     **Daybreak Home** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming.  Wells is its authorized member.

27.     **Globe Offices** is a Florida limited liability company formed in June 2019, with a principal place of business in West Palm Beach, Florida. Wells is its authorized member. Bingham opened multiple online brokerage accounts in Globe Office's name, and investor funds were transferred to those accounts for speculative trading.

28.     **Globe Property Offices** is a Florida limited liability company formed in May 2019, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

29.     **LW Square Office** is a Florida limited liability company formed in July 2018, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member. Bingham opened multiple online brokerage accounts in LW Square Office's name, and investor funds were transferred to those accounts for speculative trading.

30.     **Martinique Investments** is a Florida limited liability company formed in October 2020, with a principal place of business in West Palm Beach, Florida. Bingham is its manager.

31.     **Oakland Land Property** is a Florida limited liability company formed in September 2021, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

32.     **South Olive Office** is a Florida limited liability company formed in August 2021, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

III.    **JURISDICTION AND VENUE**

33.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

34.     This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida because: (a) Bingham and Joseph reside in this District; (b) Wells' principal place of business is in this District; (c) a significant amount of Wells' and Relief Defendants' real estate, purchased with investor funds, is located in this District, and; (d) a substantial part of the events or omissions giving rise to the violations of the Securities Act and the Exchange Act occurred in the District.

35.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV.   **FACTUAL ALLEGATIONS**

### A.     **Wells' Promissory Note Offerings**

36.     Wells holds itself out to the public through its website (recently disabled and now "under maintenance") and in marketing and offering materials as a "real estate acquisition and development company that focuses on identifying, acquiring, and managing value-added residential and commercial real estate assets in strategically targeted locations in the United States…" The website touted Wells' "Prudent Decision-Making, Rigorous Analysis, And A Focus on Sustainable Growth By Building Green Communities And Stronger Families One Investment At A Time."

37.     In marketing materials provided to investors, Wells represents that it has "a growing real estate portfolio with an estimated valuation of $450,000,000 in commercial and residential properties." Wells claims to have a "vision … to acquire, develop, and revitalize Residential & Commercial Properties located in the United States with its primary focus in South Florida[.]"

38.     As Wells' founder and CEO, Bingham is the face of the company.  In offering materials, Wells touts Bingham's real estate bona fides, stating that she is "an accomplished real estate investor with experience in real estate acquisitions, development and asset management" and who developed her own "current portfolio totaling over $100,000,000."

39.     Through its website, in marketing presentations, and through a network of sales agents, Wells promotes, among others, its Assets-to-Income Program which, according to the website, is purportedly "designed with the purpose of adding value to existing residential and commercial assets and zoned parcels of land to be used as long-term revenue-generating properties."  Investors are solicited to invest in the program and provided three options of promissory notes:

- 18-month Note paying 1% interest per month, paid monthly, and return of principal at the end of the term;

- 28-month Note paying 1% interest per month, paid monthly, with a 1% bonus paid at maturity along with the return of principal; and

- 36-month Note without monthly interest payments, but payment of 99% interest at the end of the term, along with principal repayment—effectively doubling an investor's money in 36 months.

40.     The website touted the profitability of the Assets-to-Income Program, stating that investors: "are not only taking part in the development or enhancement of those properties but also have the opportunity to generate additional cash flow on a monthly or annual basis with high returns through interest."

41.     Wells' marketing presentation used by sales agents to solicit investors states:

❖ Wells has a growing real estate portfolio with an estimated valuation of $450,000,000 in commercial and residential properties

❖ Wells portfolio consists of 80% income producing properties and 20% land for development

❖ Selected properties will be developed for mixed use for residential and commercial purposes

❖ Wells has raised upwards 40MM in  private capital from approximately 600 lenders

❖ Wells has returned over 15 MM to its lenders as of Q4 2022

42.     Wells' Private Placement Memorandum ("PPM") for the offering represents to investors that "proceeds from the sale of the Notes will be used by [Wells] to acquire whole or fractional investment interests in real property[.]"

43.     Wells' marketing materials and PPM provided to investors further assure investors of the safety and security of the Notes and the Assets-to-Income Program.  The marketing presentation used by agents to solicit investors assured investors that its "[r]eal estate assets serve as collateral" for the Notes, and showed information and pictures of "Selected Properties used as Collateral[.]"

44.     Similarly, the PPM distributed to investors also assured investors that Notes "will be considered a general debt obligation of [Wells] secured by any real estate interests and/or other assets that [Wells] owns or which we may own in the future on a rolling basis.  Note subscribers will hold a non-recorded security interest in [Wells'] assets."

45.     Wells' Notes constitute investment contracts and are, therefore, securities under *SEC v. Howey Co.,* 328 U.S. 293, 298-99 (1946).  With respect to this investment program, there was (a) an investment of money; (b) in a common enterprise; and (c) based on the expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  *SEC v. Friendly Power Co., LLC,* 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).  Further, the Notes issued by Wells

are promissory notes constituting securities under *Reves v. Ernst & Young*, 494 U.S. 56, 65, 67 (1990).

46. At all times material to this Complaint, Bingham and/or Joseph managed and controlled the general affairs of Wells and had the power to directly or indirectly control or influence the specific company policies which resulted in Wells' violations of the anti-fraud and registration provisions of the federal securities laws.

**B.** **Defendants Solicit Investments in Wells' Notes**

47. Wells marketed its Assets-to-Income Program and Notes on its website. Bingham and Joseph, who control Wells' day-to-day operations, also hired a group of unregistered sales agents to sell Wells' Notes to investors. Some of the sales agents worked at the Wells' office in West Palm Beach and received hourly salaries and percentage-based commissions for each Note sold.

48. Defendants also solicited investors through a network of independent sales agents nationwide, who were paid percentage-based commissions—with the highest commissions of at least 15% of the Note value. These independent sales agents were paid a percentage of the Note sold and received higher percentages for selling longer term Notes.

49. Defendants provided sales agents with binders of Wells' marketing materials, including its Assets-to-Income Program presentation and a summary of business operations. Bingham and Joseph worked with internal sales agents to close sales with investors. Joseph also arranged in-house sales agent trainings and led weekly sales meetings with the sales agents.

50. During the Relevant Period, Defendants raised at least $56 million from at least 660 investors nationwide. A substantial portion of funds raised came from investor retirement savings.

C.      **Defendants' Material Misrepresentations and Omissions to Investors, and Misuse of Investor Funds**

51.     In solicitations to investors through Wells' marketing materials and offering materials, investor presentations, and Wells' website, Defendants made material misrepresentations, and failed to disclose material information necessary to make the statements made to investors not misleading, about: (i) the size, security, and profitability of Wells' real estate portfolio; (ii) the use of investor funds for speculative trading; (iii) the use of investor funds to make Ponzi-like payments to other investors; (iv) the use of investor funds to pay sales agent commissions, and; (v) the fact that Joseph—a convicted felon—is a control person of Wells.

*(i)      Misrepresentations About Wells' Real Estate Portfolio*

52.     Contrary to Defendants' representations to investors that Wells' real estate portfolio is worth $450 million, an analysis of Wells' and Relief Defendants' bank and property records show that Wells and Relief Defendants acquired approximately 34 properties valued at about $46 million at the time of their acquisition.

53.     According to publicly available property records, many of the properties were financed with mortgages, and it appears the balance of the purchase prices were paid for with investor proceeds. Several of the properties have been refinanced at least once. Moreover, in the past ten months, several mortgagees and other lenders that provided financing to Wells and Relief Defendants have filed lawsuits alleging defaults on more than $20 million in mortgages and other debt financing collateralized by these properties. Defendants have also sold or transferred some of the properties.

54.     Additionally, bank records show that while some of the properties are generating revenue, that revenue is insufficient to generate the promised returns to investors. As a result,

Wells has depended on new investor funds to make interest payments to existing investors in a Ponzi-like fashion, as further discussed below.

        ***(ii)***     ***Misuse of Investor Funds to Engage in Speculative Options Trading***

55.     Contrary to Wells' representation to investors that their funds will be used to "acquire, develop, and revitalize Residential and Commercial Properties," Defendants have diverted at least $28 million of investor funds to engage in speculative options trading.

56.     Specifically, Bingham, who has sole signatory authority over all of Wells' and Relief Defendants' bank accounts, opened at least 42 brokerage accounts at broker-dealers in the name of Wells and many of the Relief Defendants. These brokerage accounts were funded with Wells' investors' funds, and Joseph engaged in securities trading in those accounts.

57.     Joseph established a "trading room" for Wells, and openly boasted to employees about being able to "double" Wells' money through trading. Directly contradicting Wells' pitch to investors that their funds would be used for Wells' real estate portfolio, Joseph told at least one former employee that there was "no reason to invest in real estate. Zero. There's zero reason to invest in real estate."

58.     Joseph explained to the former employee that trading was much more lucrative, and it was also necessary because Wells did not generate enough property rental income to support its business operations. Indeed, contrary to representations made to investors, Joseph told employees that Wells raised investor funds so that he could trade securities.

59.     In reality, Joseph was not successful with his trading strategy and Defendants lost approximately $12 million trading securities. Defendants did not disclose any of these material facts to investors.

### (iii)    *Misuse of Investor Funds to Make Ponzi Payments to Investors*

60.    Contrary to Wells' representations to investors that Wells' Assets-to-Income Program would generate cash flow from real estate and that Wells had returned over $15 million to its lenders, Wells loses money and the revenues produced by the properties are insufficient to cover the expenses and amounts due to investors.

61.    An analysis of the bank and brokerage accounts of Wells and the Relief Defendants discloses that Wells has been operating a Ponzi scheme and paying interest and principal payments on Notes using other investor funds since at least 2020.

62.    Wells' cash flow does not support its business activity, resulting in net cash outflow of approximately $23 million.  As such, Wells' operations are dependent on injections of new investor money and its operations are unsustainable.

63.    From January 2020 to present, Defendants have diverted approximately $10 million of investor funds to make Ponzi-like interest payments to investors and to satisfy Note redemptions.

### (iv)    *Misuse of Investor Funds to Pay Sales Agents Undisclosed Commissions*

64.    Contrary to the representations in the Assets-to-Income Program PPM section on "Selling Commissions and Discounts[,]" that "Notes will be offered and sold by the Company's Management who will not receive remuneration in connection with the placement of Notes[,]" Wells used internal and external sales agents to solicit investors and used investor funds to pay commissions to sales agents.

65.    Nowhere in the PPM, or any of the other offering or marketing materials, do Defendants disclose that percentage-based commissions, as high as 15%, are paid to independent sales agents in connection with the sale of the Notes.  Nor did Defendants disclose that internal

sales agents, who were paid hourly, also received percentage-based commissions on the value of the Notes sold to investors.

66.     From January 2020 to present, Wells paid commissions of approximately $6.9 million to outside sales agents, which came from investor funds.

**(v)     Failure to Disclose Joseph's Role as Control Person**

67.     Wells touts the business experience of its CEO Bingham, including that she "has successfully built a strong current portfolio over $100 [million]." Although Bingham holds herself out as the founder and CEO of Wells, she shares the control and management of Wells with her husband, Joseph, a convicted felon and undisclosed principal and control person of Wells and the Relief Defendants. In fact, according to one former employee, Joseph "made all the decisions."

68.     Among other things, Joseph actively participates in training and interviewing employees, including internal sales agents. Joseph organized and led weekly meetings with staff and meets with outside sales agents. Joseph also has an integral role in Wells' undisclosed options trading strategy, running Defendants' "trading room," and boasting to employees how trading is more lucrative than real estate.

69.     Despite being a control person of Wells and Relief Defendants, Joseph is not identified or disclosed on Wells' investor documents, the Assets-to-Income Program materials, the PPM, or Wells' website. To the contrary, when interacting with employees, sales agents and investors, Joseph attempts to hide his identity by using the first name "Jon" when his real first name is "Jean."

70.     Joseph's identity and involvement in Wells are likely hidden because he is a recently convicted felon who pleaded guilty in November 2019 to one count of wire fraud [18 U.S.C. § 1343] for misappropriating approximately $3 million while operating his business,

Evergreen. On March 17, 2020, the district court entered a criminal judgment against Joseph, sentencing him to fifteen months of imprisonment, and ordering him to pay $3,070,000 in restitution. On July 14, 2021, Joseph was given supervised release for three years and it appears to have been recently extended.

71. Defendants have materially misled investors by failing to disclose that Joseph, a convicted felon who, during much of the Relevant Period, was incarcerated or on supervised release, was an undisclosed control person of Wells' investment offerings and securities trading scheme.

**D.** **Defendants' Misappropriation of Investor Funds**

72. From January 2020 to present, Defendants Bingham and Joseph, directly and indirectly, also misappropriated at least $1.8 million of investor funds for themselves. An analysis of Wells' and Relief Defendants' bank accounts—wholly controlled by Bingham—reveals that Bingham and Joseph used at least $1.8 million of investor funds for personal expenses, including cash withdrawals, luxury cars, living expenses such as groceries, and even settlement of a private lawsuit for $293,000. For example, Cambridge bank records show that on March 21, 2023, Joseph spent $60,228.23 at Tesla Motors.

73. In addition, on or about January 6, 2023, Wells, through Relief Defendant 930 Parkside LLC, purchased a residential house in West Palm Beach (the "WPB House") for $1.95 million. On August 10, 2023, just eight months after the purchase, 930 Parkside LLC quit-claimed the WPB House to Bingham in her personal capacity for $10.

**E.     Defendants Engaged in Unregistered Broker-Dealer Activity**

74.     During the Relevant Period, Defendants offered and sold securities issued by Wells under, among others, its Assets-to-Income Program, raising over $56 million from at least 660 investors.

75.     Bingham and Joseph played a significant role in Wells' offering and Ponzi scheme, hiring and training a team of internal sales agents, and retaining a network of independent sales agents nationwide.  Bingham and Joseph provided sales agents with offering materials, a marketing presentation, and all the tools necessary to pitch the Assets-to-Income Program, including arranging in-house sales agent trainings and leading weekly meetings with in-house sales agents.

76.     Wells paid at least $6,865,973 of investor funds in the form of commissions to independent sales agents, and Bingham and Joseph diverted millions for themselves.

77.     Bingham opened brokerage accounts at a broker-dealer on behalf of Wells and many of the Relief Defendants.  Bingham and Joseph used $28 million of investor proceeds to trade options and other securities over the course of several years.

78.     At all relevant times, Wells was not registered with the Commission as a broker-dealer.

79.     At all relevant times, Bingham and Joseph held no securities licenses, were not registered with the Commission, and were not associated with an entity registered with the Commission.

**F.     Relief Defendants Receive Investor Funds and Related Assets**

80.     During the Relevant Period, Relief Defendants were closely-held affiliated companies through which Defendants purchased properties with Wells' investor funds.  Many of the Relief Defendants also maintained bank accounts funded with investor funds, and maintained

brokerage accounts funded with investor funds through which they traded securities. The Relief

Defendants received investor funds for no apparent legitimate purpose.

## V.    CLAIMS FOR RELIEF

### COUNT I

#### Violations of Section 17(a)(1) of the Securities Act
**(Against All Defendants)**

81.    The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

82.    From approximately January 2020 until at least May 2024, Defendants, in the offer

or sale of securities by use of the means or instruments of transportation or communication in

interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly

employed devices, schemes or artifices to defraud.

83.    By reason of the foregoing, Defendants, directly or indirectly, have violated and

unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act

[15 U.S.C. § 77q(a)(1)].

### COUNT II

#### Violations of Section 17(a)(2) of the Securities Act
**(Against All Defendants)**

84.    The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

85.    From approximately January 2020 until at least May 2024, Defendants, in the offer

or sale of securities by use of the means or instruments of transportation or communication in

interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or

property by means of untrue statements of material facts or omissions to state material facts

necessary to make the statements made, in light of the circumstances under which they were made,

not misleading.

86.     By reason of the foregoing, Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

### Violations of Section 17(a)(3) of the Securities Act
### (Against All Defendants)

87.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

88.     From approximately January 2020 until at least May 2024, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

89.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)
### (Against All Defendants)

90.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

91.     From approximately January 2020 until at least April 2024, the Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

92.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] thereunder.

## COUNT V

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against All Defendants)

93.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

94.     From approximately January 2020 until at least April 2024, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     By reason of the foregoing, Defendants, directly and indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

## COUNT VI

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)
### (Against All Defendants)

96.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

97.     From approximately January 2020 until at least April 2024, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

98.     By reason of the foregoing, the Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] thereunder.

## COUNT VII

### Violations of Section 20(a) of the Exchange Act—Control Person Liability
(Against Bingham and Joseph)

99.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

100.    From at least January 2020 through July 2024, Bingham was, directly or indirectly, a control person of Defendant Wells for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

101.    From at least January 2020 through October 2023 (and possibly later), Joseph was, directly or indirectly, a control person of Defendant Wells for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

102.    From approximately January 2020 through April 2024, Wells violated Section 10(b) and Rule 10b-5 of the Exchange Act.

103.    As control persons of Wells, Bingham and Joseph are jointly and severally liable with and to the same extent as Wells for each of its respective violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

104.    By reason of the foregoing, Defendants Bingham and Joseph have violated and, unless enjoined, are reasonably likely to continue to violate Sections 10(b) and 20(a), and Rule 10b-5 of the Exchange Act [15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5].

## COUNT VIII

### Violations of Section 15(a)(1) of the Exchange Act
**(Against All Defendants)**

105.    The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

106.    From approximately January 2020 until at least May 2024, the Defendants, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer.

107.    By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

## COUNT IX

### Unjust Enrichment
**(Against Relief Defendants)**

108.    The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

109.    The Relief Defendants obtained investor funds as part, and in furtherance of, the securities violations alleged above without a legitimate claim to those funds.   Under those circumstances, it is not just, equitable, or considerable for the Relief Defendants to retain the funds. The Relief Defendants were unjustly enriched.

## VI.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.      Permanent Injunction

Issue Permanent Injunctions enjoining Wells, Bingham and Joseph, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]; and Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)]; and further enjoining Bingham and Joseph from violating Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

### B.      Disgorgement and Prejudgment Interest

Issue an order directing Defendants and Relief Defendants, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, to disgorge all ill-gotten gains received within the applicable statute of limitations, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### C.      Asset Freeze and Sworn Accountings

Issue an order freezing the assets of the Defendants and Relief Defendants and requiring Defendants to file sworn accountings with the Court.

### D.      Appointment of a Receiver

Appoint a receiver over the Defendant Wells and Relief Defendants.

### E.      Records Preservation

Issue an order requiring Defendants, including their officers, agents, servants, employees, and attorneys, and Relief Defendants, including their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with Defendants and/or Relief

Defendants, to preserve any records related to the subject matter of this lawsuit that are in their possession, custody, or subject to their control.

**F.**    **Civil Monetary Penalties**

Issue an order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**G.**    **Officer and Director Bar Against Bingham and Joseph**

Issue an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], permanently prohibiting Bingham and Joseph from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

**H.**    **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

**I.**    **Retention of Jurisdiction**

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

**VII.**    **DEMAND FOR JURY TRIAL**

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated:  August 12, 2024

Respectfully submitted:

By: _____

Brian Lechich, Esq.
Florida Bar No. 84419
Trial Counsel
Email: LechichB@sec.gov
Phone: (305) 416-6257
*Lead Attorney*

and

Hughens Dolisca, Esq.
Florida Bar No. 99744
Senior Counsel
Email: DoliscaH@sec.gov
Phone: (305) 982-6344

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone:  (305) 982-6300
Facsimile:   (305) 536-4154