**SEALED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.



FILED BY _____ D.C.

AUG 1 2 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.                                                                    **Filed Under Seal**

WELLS REAL ESTATE INVESTMENT, LLC,
JANALIE C. JOSEPH A/K/A JANALIE C. BINGHAM,
and JEAN JOSEPH,

Defendants, and

CAMBRIDGE REAL ESTATE MANAGEMENT, LLC,
60 YACHT CLUB, LLC,
112 SOUTH OLIVE, LLC,
791 PARKSIDE HOME, LLC,
910 PARKSIDE, LLC,
930 PARKSIDE, LLC,
976 PALM BEACH SQUARE, LLC,
1070 BOCA RATON SQUARE, LLC,
2082 PARADISE PALM, LLC,
2295 CORPORATE BLVD LLC,
4050 NW, LLC,
4100 HOSPITAL OFFICE, LLC,
4800 FEDERAL, LLC,
7352 VALENCIA, LLC,
7483 VALENCIA, LLC,
BOCA DEERFIELD PROPERTIES, LLC,
DAYBREAK HOME, LLC,
GLOBE OFFICES, LLC,
GLOBE PROPERTY OFFICES, LLC,
LW SQUARE OFFICE, LLC,
MARTINIQUEÂ INVESTMENTS LLC
         a/k/a MARTINIQUE'S INVESTMENTS LLC,
OAKLAND LAND PROPERTY, LLC, and
SOUTH OLIVE OFFICE, LLC,

Relief Defendants.
_____/

**SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY *EX PARTE* MOTION
AND MEMORANDUM OF LAW FOR ASSET FREEZE AND OTHER RELIEF**

**Table of Contents**

I.   INTRODUCTION                                                                                    1
II.  DEFENDANTS AND RELIEF DEFENDANTS                                                                3
     A. Defendants                                                                                   3
     B. Relief Defendants                                                                            4
III. JURISDICTION AND VENUE                                                                          9
IV.  FACTUAL BASIS FOR ASSET FREEZE AND OTHER RELIEF                                                 9
     A. Wells' Promissory Note Offerings                                                             9
     B. Defendants Solicit Investments in Wells' Notes                                              13
     C. Defendants' Material Misrepresentations and Omissions to
        Investors, and Misuse of Investor Funds                                                     14
        1. *Misrepresentations About Wells' Real Estate Portfolio*                                  14
        2. *Misuse of Investor Funds to Engage in Speculative Options Trading*                      15
        3. *Misuse of Investor Funds to Make Ponzi Payments to Investors*                           16
        4. *Misuse of Investor Funds to Pay Sales Agents Undisclosed Commissions*                   17
        5. *Failure to Disclose Joseph's Role as Control Person*                                    18
     D. Defendants' Misappropriation of Investor Funds                                              19
     E. Defendants Engaged in Unregistered Broker-Dealer Activity                                   20
     F. Relief Defendants Receive Investor Funds and Related Assets                                 21
V.   MEMORANDUM OF LAW                                                                              21
     A. The Standard for Obtaining an *Ex Parte* Asset Freeze                                       21
     B. The Evidence Establishes *Prima Facie* Violations of the Securities
        Laws and a Likelihood of Success on the Merits                                              22
        1. *The Notes Are Securities Under the Reves Note Analysis*                                 23
        2. *The Notes Are Securities Under the Howey Investment Contract Test*                      24
        3. *Defendants Used Interstate Commerce*                                                    27
        4. *Defendants Violate Securities Act Section 17(a) and Exchange Act
           Section 10(b) and Rule 10b-5*                                                            27
           a. Defendants' Misrepresentations and Omissions                                          28
           b. The Misrepresentations and Omissions Were Material                                    29
           c. Defendants' Scheme to Defraud                                                         31
           d. Defendants Acted with Scienter                                                        32
        5. *Defendants Are Violating Exchange Act Section 15(a)*                                     35
        6. *Bingham and Joseph Are Control Persons Under Exchange Act
           Section 20(a)*                                                                           36
        7. *Relief Defendants Have Received Investor Funds*                                         38
        8. *The Commission Has Established a Likelihood of Success on the Merits*                    38
     C. The Commission's Evidence Establishes the Likelihood of Irreparable Harm                    39
     D. The Balance of the Equities Tip Heavily in the Commission's Favor                           40
     E. The Asset Freeze Is in the Public's Interest                                                41
     F. A Total Asset Freeze Is Appropriate                                                         42
     G. Sworn Accountings Are Necessary and Appropriate                                             43
     H. An Order Prohibiting Record Destruction Is Necessary and Appropriate                        43
VI.  CONCLUSION                                                                                     43

## Index of Exhibits

**Exhibit 1**      Declaration of Raymond Andjich

**Exhibit 2**      Declaration of Manuel Francisco Cruz

**Exhibit 3**      Declaration of Brian James Barriger

**Exhibit 4**      Notice to Appear, June 2, 2021, *Amaltheia Capital Ltd. v. Joseph*, S.D.
Fla. Case No. 19-cv-62746 (DE 33)

**Exhibit 5**      Affidavit of Sandra Peart Bingham, *Amaltheia Capital Ltd. v. Joseph*
(DE 34)

**Exhibit 6**      Declaration of Adam Karasick

**Exhibit 7**      Declaration of Celeste Byrd

**Exhibit 8**      Indictment of Jean Joseph, *U.S. v. Joseph*, S.D. Fla. Case No. 19-20177-
CR (DE 3)

**Exhibit 9**      Factual Proffer of Joseph, *U.S. v. Joseph* (DE 42)

**Exhibit 10**     Plea Agreement of Joseph, *U.S. v. Joseph* (DE 39)

**Exhibit 11**     Final Judgment in Criminal Case, *U.S. v. Joseph* (DE 59)

**Exhibit 12**     Request for Modifying the Conditions or Term of Supervision with
Consent of the Offender, *U.S. v. Joseph* (DE 71)

**Exhibit 13**     Standard Conditions of Bond, *U.S. v. Joseph* (DE 78)

**Exhibit 14**     Declaration of Joseph Morgan, May 23, 2024, and Webcapture

**Exhibit 15**     Declaration of Joseph Morgan, Nov. 14, 2023, and Webcapture

**Exhibit 16**     Declaration of Rae Ann Winn

**Exhibit 17**     Declaration of Laura Lee Nemchik

**Exhibit 18**     Bank of America Statements (payments to Kaplan, Tesla)

**Exhibit 19**     Bank of America Documents (recent transfers)

**Exhibit 20**     Proposed Order

## I.   **INTRODUCTION**

The Securities and Exchange Commission (the "Commission" or "SEC") files this emergency action to prevent further dissipation and conversion of investor assets by Wells Real Estate Investment, LLC ("Wells"), its Chief Executive Officer ("CEO"), Janalie C. Joseph a/k/a Janalie C. Bingham ("Bingham"), and undisclosed control person and previously convicted felon Jean Joseph ("Joseph") (collectively, "Defendants"). As alleged in the Complaint, from at least January 2020 to at least May 2024 (the "Relevant Period"), Defendants have raised at least $56 million from at least 660 investors nationwide through a fraudulent offering of promissory notes to investors, issued by Wells, promising annual returns of 12% to 33% (the "Note(s)"). Wells offers the Notes through its Assets-to-Income Program and network of internal and independent sales agents. Defendants represent to investors that Wells has a $450 million real estate portfolio, and assure investors that their funds will be used to "acquire, develop, and revitalize Residential and Commercial Properties ... with its primary focus on South Florida."

Contrary to these representations, Wells used only a fraction of investor funds to purchase real properties, which are substantially financed through mortgages, and which produce insufficient revenue to pay promised returns to investors. Defendants manage and hold the properties through 23 affiliated limited liability companies ("Relief Defendants").[1] In addition to

---

[1] Relief Defendants are Cambridge Real Estate Management, LLC ("Cambridge"), 60 Yacht Club, LLC ("60 Yacht Club"), 112 South Olive, LLC ("112 South Olive"), 791 Parkside Home, LLC ("791 Parkside"), 910 Parkside, LLC ("910 Parkside"), 930 Parkside, LLC ("930 Parkside"), 976 Palm Beach Square, LLC ("976 Palm Beach Square"), 1070 Boca Raton Square, LLC ("1070 Boca Square"), 2082 Paradise Palm, LLC ("2082 Paradise"), 2295 Corporate Blvd LLC ("2295 Corporate Blvd"), 4050 NW, LLC ("4050 NW"), 4100 Hospital Office, LLC ("4100 Hospital"), 4800 Federal, LLC ("4800 Federal"), 7352 Valencia, LLC ("7352 Valencia"), 7483 Valencia, LLC ("7483 Valencia"), Boca Deerfield Properties, LLC ("Boca Deerfield Properties"), Daybreak Home, LLC ("Daybreak Home"), Globe Offices, LLC ("Globe Offices"), Globe Property Offices, LLC ("Globe Property"), LW Square Office, LLC ("LW Square"),

Defendants' false claims about Wells' real estate portfolio and its profitability, Defendants have misused and misappropriated millions of investor funds. Bingham and Joseph transferred at least $28 million to brokerage firms, where they engaged in speculative options trading, losing approximately $12 million of investor funds. Bingham and Joseph have also used $6.8 million of investor funds to pay undisclosed commissions to sales agents and, in a Ponzi-like fashion, used investor funds to make interest payments and redemptions to investors. Bingham and Joseph have also misappropriated approximately $1.8 million for personal expenses and transferred at least $1.9 million of Wells-financed real estate to Bingham. None of these material facts were disclosed to investors. Nor did Defendants disclose the fact that Wells is also controlled by the CEO's husband, Joseph, who is a convicted felon on Court ordered supervision.

Through their fraudulent conduct, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]. Further, Defendants Bingham and Joseph, directly and indirectly, violated Exchange Act Section 10(b) and Rule 10b-5 as control persons of Wells under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]. To protect investors and to prevent further dissipation of assets, the Commission seeks asset freezes and other emergency relief against Defendants and Relief Defendants.

---

Martiniqueâ Investments LLC a/k/a Martinique's Investments LLC ("Martinique Investments"), Oakland Land Property, LLC ("Oakland Land"), and South Olive Office, LLC ("South Olive").

## II.   DEFENDANTS AND RELIEF DEFENDANTS

### A. Defendants

1.      **Wells** is a Wyoming limited liability company formed in 2017 with its principal place of business in West Palm Beach, Florida.[2]  Wells acquires, sells, borrows against, and manages commercial and residential real estate, including through the Relief Defendants.[3]

2.      **Bingham** resides in Boca Raton, Florida.[4]  According to documents provided to investors, Bingham is Wells' founder and CEO and controls 100% of Wells' equity membership interest.[5]  Bingham is married to Defendant Joseph[6] and, together they maintain operational control over Wells and Relief Defendants.[7]  Bingham has sole signatory authority over all of Wells' and Relief Defendants' bank and brokerage accounts.[8]  Bingham has never held any securities licenses or been associated with any entity registered with the Commission.[9]

---

[2] Declaration of Raymond Andjich (**Exhibit 1**) at Exhibit C (PDF p. 213-220 of 485); Declaration of Manuel Francisco Cruz (**Exhibit 2**) ¶¶ 4, 8.

[3] *See* **Ex. 2** at ¶¶ 5, 13, 20; Declaration of Brian James Barriger (**Exhibit 3**) at ¶ 8; **Ex. 3.B** at pp. 3-5 (or PDF pp. 12-14 of 74).

[4] U.S. District Court Notice to Appear, June 2, 2021, filed in *Amaltheia Capital Ltd. v. Joseph*, S.D. Fla. Case No. 19-cv-62746, DE 33 (identifying Boca Raton addresses for Bingham) (**Exhibit 4**) at p. 1 (PDF p. 2 of 4); *see also* Sandra Peart Bingham Affidavit at ¶ 3, filed in *Amaltheia Capital Ltd. v. Joseph*, S.D. Fla. Case No. 19-cv-62746, DE 34-1 (identifying Bingham as "a Florida resident" in affidavit by Bingham's mother) (**Exhibit 5**) at p. 7, ¶ 8 (PDF p. 8 of 13).  The Commission requests that the Court take judicial notice of all filings in this *Amaltheia Capital Ltd.* civil case under Fed. R. Evid. 201(b)(2).  "A district court may take judicial notice of public records within its files relating to a particular case before it or other related cases." *Cash Inn of Dade, Inc. v. Metro. Dade Ctny*, 938 F.2d 1239, 1243 (11th Cir. 1991).

[5] **Ex. 3** at ¶ 5; *see also* **Ex. 3** at ¶ 8, **Ex. 3.B** at p. 12 (PDF p. 21 of 74); **Ex. 3** at ¶ 18, **Ex. 3.D** at pp. 16, 18-19 (PDF pp. 55, 57-58 of 74).

[6] Bingham Affidavit at ¶¶ 3, 14, filed in *Amaltheia Capital Ltd. v. Joseph*, S.D. Fla. Case No. 19-cv-62746, DE 34-2 (**Exhibit 5**) at pp. 9-10, ¶¶ 3, 14 (PDF pp. 10-11 of 13).

[7] *See* **Ex. 2** at ¶¶ 5, 7-8, 16, 20-26.

[8] Declaration of Adam Karasick (**Exhibit 6**) at ¶¶ 12 and 14.

[9] Declaration of Celeste Byrd (**Exhibit 7**) at ¶¶ 3 and 5.

3

3.       **Joseph** resides in or around Boca Raton, Florida.[10]  Joseph is the former manager of Evergreen United Investments, LLC ("Evergreen").[11]  In April 2019, Joseph and Evergreen were indicted by the U.S. Attorney's Office for the Southern District of Florida for one count of wire fraud in violation of Title 18, United States Code, Section 1343.[12]  In November 2019, Joseph pleaded guilty to one count of wire fraud, and was sentenced to 15 months in prison and ordered to pay approximately $3 million in restitution.[13]  Joseph was released from prison in 2021 and placed on three years of supervised release.[14]  Based on July 2024 filings in Joseph's criminal case, a supervised release revocation proceeding was commenced against Joseph, all of his supervised release conditions were incorporated, and Joseph stipulated to a $25,000 bond.[15] During the Relevant Period, Joseph did not hold any securities licenses, nor was he associated with any entity registered with the Commission.[16]

### B.  Relief Defendants

1.       **Cambridge** is a Florida limited liability company, claiming to have a current principal place of business in Las Vegas, Nevada.[17]   Wells is its authorized member.[18]

---

[10] *See* **Ex. 2** at ¶ 27.
[11] *See U.S. v. Joseph*, S.D. Fla. Case No. 19-20177-CR, Indictment at ¶ 2, DE 3 (**Exhibit 8**); Factual Proffer at p. 1, DE 42 (**Exhibit 9**).  The Commission requests that the Court take judicial notice of all filings in this criminal case under Fed. R. Evid. 201(b)(2).  *See Cash Inn of Dade, Inc.*, 938 F.2d at 1243.
[12] **Ex. 8** at pp. 2-5.
[13] *Id.*, Plea Agreement at ¶ 1, DE 39 (**Exhibit 10**); *see also id.* at Final Judgment in Criminal Case at pp. 1, 2, and 5, DE 59 (**Exhibit 11**).
[14] Request for Modifying the Conditions or Term of Supervision with Consent of the Offender at 2, DE 71 (**Exhibit 12**) (PDF p. 2 of 3).
[15] *Id.*, Standard Conditions of Bond at DE 78 (**Exhibit 13**).
[16] **Ex. 7** at ¶¶ 3 and 6.
[17] **Ex. 1** at ¶ 6, Ex. C (PDF pp. 221-225 of 485).
[18] *Id.*

Cambridge manages properties owned by Wells and its affiliates.[19]   Multiple online brokerage accounts were opened in Cambridge's name, and investor funds were transferred to those accounts for speculative trading.[20]

2.      **60 Yacht Club** is a Florida limited liability company formed in May 2021, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[21]   Multiple online brokerage accounts were opened in 60 Yacht Club's name, and investor funds were transferred to those accounts for speculative trading.[22]

3.      **112 South Olive** is a Florida limited liability company formed in August 2022, claiming to have its principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[23]

4.      **791 Parkside Home** is a Florida limited liability company formed in July 2021, claiming to have its principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[24]

5.      **910 Parkside** is a Florida limited liability company formed in August 2022, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[25]

---

[19] Declaration of Joseph Morgan, May 23, 2024 (**Exhibit 14**) at PDF pp. 6 and 20 of 26 (attaching Wells' May 23, 2024, website, including the section on "Wells Commercial and Residential Portfolio," which advises that Wells' commercial and residential portfolio is "currently managed by [Cambridge].").
[20] *See* **Ex. 6** at ¶¶ 14-15 and Table 2.
[21] **Ex. 1.C** (PDF pp. 226-30 of 485).
[22] *See* **Ex. 6** at ¶¶ 14-15 and Table 2.
[23] **Ex. 1.C** (PDF pp. 231-35 of 485).
[24] *Id.* (PDF pp. 236-40 of 485).
[25] *Id.* (PDF pp. 241-50 of 485).

6.      **930 Parkside** is a Florida limited liability company formed in August 2022, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[26]

7.      **976 Palm Beach Square** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming, and Wells is its authorized member.[27]

8.      **1070 Boca Raton Square** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming, and Wells is its authorized member.[28]  Multiple online brokerage accounts were opened in 1070 Boca Raton Square's name, and investor funds were transferred to those accounts for speculative trading.[29]

9.      **2082 Paradise Palm** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming, and Wells is its authorized member.[30]

10.     **2295 Corporate Blvd** is a Florida limited liability company formed in December 2022, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[31]

11.     **4050 NW** is a Florida limited liability company formed in December 2022, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[32]

---

[26] *Id.* (PDF pp. 251-55 of 485).
[27] *Id.* (PDF pp. 256-61 of 485).
[28] *Id.* (PDF pp. 262-66 of 485).
[29] *See* **Ex. 6** at ¶¶ 14-15 and Table 2.
[30] **Ex. 1.C** (PDF pp. 267-72 of 485).
[31] *Id.* (PDF pp. 273-77 of 485).

12.     **4100 Hospital Office** is a Florida limited liability company formed in March 2019, with its principal place of business in West Palm Beach, Florida, and Wells is its manager and Bingham is its registered agent.[33]

13.     **4800 Federal** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[34]  Multiple online brokerage accounts were opened in 4800 Federal's name, and investor funds were transferred to those accounts for speculative trading.[35]

14.     **7352 Valencia** is a Florida limited liability company formed in June 2022, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[36]

15.     **7483 Valencia** is a Florida limited liability company formed in May 2022, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[37]

16.     **Boca Deerfield Properties** is a Florida limited liability company formed in September 2022, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[38]

17.     **Daybreak Home** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming, and Wells is its authorized member.[39]

---

[32] *Id.* (PDF pp. 278-82 of 485).
[33] *Id.* (PDF pp. 283-88 of 485).
[34] *Id.* (PDF pp. 289-93 of 485).
[35] *See* **Ex. 6** at ¶¶ 14-15 and Table 2.
[36] **Ex. 1.C** (PDF pp. 294-98 of 485).
[37] *Id.* (PDF pp. 299-303 of 485).
[38] *Id.* (PDF pp. 304-08 of 485).

18.     **Globe Offices** is a Florida limited liability company formed in June 2019, with a principal place of business in West Palm Beach, Florida, and Wells is its authorized member.[40] Multiple online brokerage accounts were opened in Globe Office's name, and investor funds were transferred to those accounts for speculative trading.[41]

19.     **Globe Property Offices** is a Florida limited liability company formed in May 2019, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[42]

20.     **LW Square Office** is a Florida limited liability company formed in July 2018, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[43]  Multiple online brokerage accounts were opened in LW Square Office's name, and investor funds were transferred to those accounts for speculative trading.[44]

21.     **Martinique Investments** is a Florida limited liability company formed in October 2020, with a principal place of business in West Palm Beach, Florida, and Bingham is its manager.[45]

22.     **Oakland Land Property** is a Florida limited liability company formed in September 2021, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[46]

---

[39] *Id.* (PDF pp. 309-13 of 485).
[40] *Id.* (PDF pp. 314-18 of 485).
[41] *See* **Ex. 6** at ¶¶ 14-15 and Table 2.
[42] **Ex. 1.C** (PDF pp. 319-24 of 485).
[43] *Id.* (PDF pp. 325-29 of 485).
[44] *See* **Ex. 6** at ¶¶ 14-15 and Table 2.
[45] **Ex. 1.C** (PDF pp. 330-38 of 485).
[46] *Id.* (PDF pp. 348-52 of 485).

23.     **South Olive Office** is a Florida limited liability company formed in August 2021, claiming to have a current principal place of business in Las Vegas, Nevada, and Wells is its authorized member.[47]

### III.   JURISDICTION AND VENUE

The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].   The Court has personal jurisdiction over Defendants and venue is proper in the Southern District of Florida because: (a) Bingham and Joseph both reside in this District;[48] (b) Wells' principal place of business is in this District;[49] and (c) a substantial part of the events or omissions giving rise to the violations of the Securities Act and Exchange Act occurred in this District.[50]

### IV.   FACTUAL BASIS FOR ASSET FREEZE AND OTHER RELIEF

#### A. Wells' Promissory Note Offerings

Wells holds itself out to the public through its website (recently disabled and now "under maintenance") and in marketing and offering materials as a "real estate acquisition and development company that focuses on identifying, acquiring, and managing value-added residential and commercial real estate assets in strategically targeted locations in the United States..."[51] The website touted Wells' mission as follows:[52]

---

[47] *Id.* (PDF pp. 339-47 of 485).
[48] *See supra* Section II.A.2 and 3.
[49] *See supra* Section II.A.1.
[50] *See, e.g.,* **Ex. 2** at ¶¶ 4-29.
[51] **Ex. 3.D** at p. 1 (PDF p. 41 of 74).
[52] Declaration of Joseph Morgan, Nov. 14, 2023 (**Exhibit 15**) at p. 8 (PDF p. 9 of 38).

# Our
# Mission

At Wells Real Estate Investment, **Our Mission** Is To
Create Long-Term Value And Wealth For Our Clients By
Strategically Investing In High-Quality Real Estate Assets
With Peace Of Mind. We Are Committed To Delivering
**Exceptional Returns** Through Prudent Decision-Making,
Rigorous Analysis, And A Focus On **Sustainable Growth
By Building Green Communities** And Stronger Families
One Investment At A Time.

In marketing materials provided to investors, Wells represents that it has a "growing real estate portfolio with an estimated valuation of $450,000,000 in commercial and residential properties."[53] Wells claims to have a "vision … to acquire, develop, and revitalize Residential & Commercial Properties located in the United States with its primary focus in South Florida[.]"[54]

As Wells' founder and CEO, Bingham is the face of the company,[55] and Wells' written materials tout her real estate bona fides, stating that she is "an accomplished real estate investor with experience in real estate acquisitions, development and asset management" and who has developed her own "current portfolio totaling over $100,000,000."[56]

Through its website, in marketing presentations, and through a network of sales agents, Wells promotes, among others, its Assets-to-Income Program which, according to the website, is purportedly "designed with the purpose of adding value to existing residential and commercial

---

[53] **Ex. 3.B** at p. 5 (PDF p. 14 of 74); **Ex. 2.A** at p. 5 (PDF p. 15 of 32).
[54] **Ex. 3.B** at p. 4 (PDF p. 13 of 74).
[55] *Id.* at p. 12 (PDF p. 21 of 74); **Ex. 3.D**, p. 16 (PDF p. 56 of 74)
[56] **Ex. 3.D**, p. 16 (PDF p. 56 of 74).

10

assets and zoned parcels of land to be used as long-term revenue-generating properties."[57] Investors are solicited to invest in the program and provided three options of promissory notes:[58]

- 18-month Note paying 1% interest per month, paid monthly, and return of principal at the end of the term;

- 28-month Note paying 1% interest per month, paid monthly, with a 1% bonus paid at maturity along with the return of principal; and

- 36-month Note, without monthly interest payments, but payment of 99% interest at the end of the term, along with principal repayment—effectively doubling an investor's money in 36 months.[59]

The website touted the profitability of the Assets-to-Income Program, stating that investors: "are not only taking part in the development or enhancement of those properties but also have the opportunity to generate additional cash flow on a monthly or annual basis with high returns through interest."[60]  And Wells' marketing presentation, used by sales agents to solicit investors, advises:[61]

---

[57] **Ex. 15** at p. 17 (PDF p. 18 of 38).
[58] Over the Relevant Period, certain details, such interest rates and bonus amounts, appear to have changed.  *See* Declaration of Rae Ann Winn attached as **Exhibit 16** at ¶ 4 (explaining that Wells offered her a 2% bonus at maturity for 18-month Note and an 8% bonus at maturity for 28-month Note).
[59] **Ex. 2** at ¶ 13; *Id.* at Ex. A, p. 3, 10-11 (PDF p. 14, 19-20 of 32); **Ex. 3** at ¶ 6.
[60] **Ex. 15** at p. 22 (PDF p. 23 of 38).
[61] **Ex. 2.A** at p. 5 (PDF p. 16 of 32); *see also* **Ex. 3.B** at p. 5 (PDF p. 14 of 74).

- ❖ Wells has a growing real estate portfolio with an estimated valuation of $450,000,000 in commercial and residential properties.
- ❖ Wells portfolio consists of 80% income producing properties and 20% land for development.
- ❖ Selected properties will be developed for mixed use residential and commercial purposes
- ❖ Wells has raised upwards of 40MM in  private capital from approximately 600 lenders
- ❖ Wells has returned over 15 MM to its lenders as of Q4 2022

Similarly, Wells' Private Placement Memorandum ("PPM"), provided to investors, states that "proceeds from the sale of the Notes will be used by [Wells] to acquire whole or fractional investment interests in real property…"[62]

Wells' marketing materials and PPM further assure investors of the safety and security of the Notes and the Assets-to-Income Program.[63]  The marketing presentation used by agents to solicit investors assures investors that its "[r]eal estate assets serve as collateral" for the Notes, and showed information and pictures of "Selected Properties used as Collateral[.]"[64]  Similarly, the PPM distributed to investors pledges that Notes "will be considered a general debt obligation of [Wells] secured by any real estate interests and/or other assets that [Wells] owns or which we may own in the future on a rolling basis.  Note subscribers will hold a non-recorded security interest in [Wells'] assets."[65]

---

[62] **Ex. 3.D** at p. 16 (PDF p. 56 of 74).
[63] *See* **Ex. 3.B** at pp. 5-9 (PDF pp. 14-18 of 74).
[64] *Id.* at p. 5 (PDF p. 14 of 74).
[65] **Ex. 3.D** at p. 18 (PDF p. 58 of 74); *see also id.* at pp. ii (PDF p. 28 of 74), 1 (PDF p. 41 of 74), 11 (PDF p. 51 of 74), and A-2 (PDF p. 61 of 74).

### B. Defendants Solicit Investments in Wells' Notes

Wells marketed its Assets-to-Income Program and Notes on its website.[66]  Bingham and Joseph, who control Wells' day-to-day operations, also hired a group of unregistered sales agents to sell Wells' Notes to investors.[67]  Some of the sales agents worked at the Wells' office in West Palm Beach and received hourly salaries and percentage-based commissions for each Note sold.[68]

Defendants also solicited investors through a network of independent sales agents nationwide,[69] who were paid percentage-based commissions—with the highest commissions of at least 15% of the Note value.[70]  These independent sales agents were paid a percentage of the Note sold and received higher percentages for selling longer term Notes.[71]

Defendants provided sales agents with binders of Wells' marketing materials, including its Assets-to-Income Program presentation and a summary of business operations.[72]  Bingham and Joseph worked with internal sales agents to close sales with investors.[73]  Joseph also arranged in-house sales agent trainings and led weekly sales meetings with the sales agents.[74]

During the Relevant Period, Defendants raised at least $56 million from at least 660 investors nationwide.[75]  A substantial portion of funds raised came from investor retirement savings.[76]

---

[66] **Ex. 2** at ¶ 12; *see also* **Ex. 15** at PDF pp. 5, 9, 18, and 22-23 of 38; **Ex. 14** at PDF p. 20 of 26.
[67] **Ex. 2** at ¶¶ 8-11, 14-19; *see also* **Ex. 3** at ¶¶ 5, 7-8 and 11; **Ex. 16** at ¶¶ 3-6; *see also* Declaration of Laura Lee Nemchik (**Exhibit 17**) at ¶¶ 4-9.
[68] **Ex. 2** at ¶¶ 9-10.
[69] *See* **Ex. 16** at ¶¶ 3-6; **Ex. 17** at ¶¶ 3-6; **Ex. 3** at ¶¶ 5-8.
[70] **Ex. 3** at ¶¶ 5, 7-8.
[71] *Id.* at ¶¶ 7, 16.
[72] **Ex. 2** at ¶¶ 11-13; *see also* **Ex. 3** at ¶¶ 8-9, 15, and 17-18.
[73] *See* **Ex. 2** at ¶¶ 21 and 26.
[74] *Id.* at ¶¶ 16 and 21.
[75] **Ex. 6** at ¶¶ 16, 19, 37 38, and Table 7.

**C.** **Defendants' Material Misrepresentations and Omissions to Investors, and Misuse of Investor Funds**

As described below, in solicitations to investors through Wells' marketing materials and offering materials, investor presentations, and Wells' website, Defendants made material misrepresentations, and failed to disclose material information necessary to make the statements made to investors not misleading, about: (i) the size, security, and profitability of Wells' real estate portfolio; (ii) the use of investor funds for speculative trading; (iii) the use of investor funds to make Ponzi-like payments to other investors; (iv) the use of investor funds to pay sales agent commissions, and; (v) the fact that Joseph—a convicted fraud felon—is a control person of Wells.

### *1. Misrepresentations About Wells' Real Estate Portfolio*

Contrary to Defendants' representations to investors that Wells' real estate portfolio is worth $450 million, an analysis of Wells' and Relief Defendants' bank and property records show that Wells and Relief Defendants acquired approximately 34 properties valued at about $46 million at the time of their acquisition.[77] According to publicly available property records, many of the properties were financed with mortgages, and it appears the balance of the purchase prices were paid for with investor proceeds.[78] Several of the properties have been refinanced at least once.[79] Moreover, in the past ten months, several mortgagees and other lenders that provided

---

[76] *See* **Ex. 16** at ¶ 12; *see also* **Ex. 17** at ¶ 12.

[77] *See* **Ex. 1** at ¶ 9; *see also* **Ex. 2** at ¶ 20 (describing properties owned by Wells); **Ex. 2.A** at 6-9 (PDF pp. 17-19 of 32) (showing pictures of some of supposed Wells' properties).

[78] *See* **Ex. 1** at ¶ 9; *see also* **Ex. 1.D,** Columns J, M, O, P, Q, R, and S (PDF pp. 447-49, 451-53, 455-57, and 459-61 of 485); **Ex. 6** at ¶ 24 (providing that Wells and Relief Defendants spent $11 million on real estate in Relevant Period).

[79] **Ex. 1.D,** Columns Q, R, and S (PDF pp. 449, 453, 457, and 461 of 485).

financing to Wells and Relief Defendants have filed lawsuits alleging defaults on more than $20 million in mortgages and other debt financing collateralized by these properties.[80]

### 2. Misuse of Investor Funds to Engage in Speculative Options Trading

Contrary to Wells' representation to investors that their funds will be used to "acquire, develop, and revitalize Residential and Commercial Properties," Defendants have diverted at least $28,938,542 of investor funds to engage in speculative trading.[81]  Specifically, Bingham, who has sole signatory authority over all of Wells' and Relief Defendants' bank accounts, opened at least 30 brokerage accounts at broker-dealers in the name of Wells and many of the Relief Defendants.  These brokerage accounts were funded with Wells' investors' funds, and Joseph engaged in securities trading in those accounts.[82]

Joseph established a "trading room" for Wells, and openly boasted to employees about being able to "double" Wells' money through trading.[83]  Directly contradicting Wells' pitch to

---

[80] See U.S. Bank Trust Co. N.A. v. Boca Square One LLC, Palm Beach County Case No. 50-2024-CA-005287-XXXA-MB (suing Bingham and Wells subsidiary, Boca Square One, LLC, for mortgage foreclosure and $663,226.58 in damages, plus interest); Panorama Capital Inc. v. Bingham, Palm Beach County Case No. 50-2023-CA-016470-XXXA-MB (suing Bingham, Wells, and several affiliates/subsidiaries for breach of loan agreement and to enforce collateral agreement and seeking damages of approximately $8 million plus interest); Best Meridian Ins. Co. v. LW Square Office, LLC, Broward County Case No. CACE24001992 (suing Bingham and Wells subsidiary LW Square Office, LLC for mortgage foreclosure and approximately $7.2 million in damages); Kiegai LLC v. Boca Deerfield Properties, LLC, Broward County Case No. CACE24002586 (suing Bingham and Wells subsidiary Boca Deerfield Properties LLC for mortgage foreclosure and seeking approximately $5.2 million in damages); Rosenthal v. 60 Yacht Club LLC, Palm Beach County Case No. 50-2024-CA-004161-XXXA-MB (suing Bingham and Wells subsidiary 60 Yacht Club LLC for mortgage foreclosure and $292,500 in damages); Dolphin Day Lending LLC v. 1070 Boca Raton Square LLC, Palm Beach County Case No. 50-2023-CA-016541-XXXA-MB (suing Bingham and Well's subsidiary 1070 Boca Raton Square LLC for mortgage foreclosure and at least $535,000 in damages).  The Commission requests that the Court take judicial notice of all filings in these civil cases under Fed. R. Evid. 201(b)(2).
[81] Ex. 6 at ¶ 27 and Table 12.
[82] Id. at ¶¶ 23, 27, and 49-57; Ex. 2 at ¶¶ 21-24.
[83] Ex. 2 at ¶¶ 21-24.

investors that their funds would be used for Wells' real estate portfolio, Joseph told at least one former employee that there was "no reason to invest in real estate. Zero. There's zero reason to invest in real estate."[84]  Joseph explained to the former employee that trading was much more lucrative, and it was also necessary because Wells did not generate enough property rental income to support its business operations.[85]  Indeed, contrary to representations made to investors,[86] Joseph told employees that Wells raised investor funds so that he could trade securities.[87]

In reality, Joseph was not successful with his trading strategy, and Defendants lost approximately $12 million trading securities.[88]  Defendants failed to disclose these material facts to investors.[89]

### 3. *Misuse of Investor Funds to Make Ponzi Payments to Investors*

Contrary to Wells' representations to investors that Wells' Assets-to-Income Program would generate cash flow from real estate and that Wells had returned over $15 million to its lenders, Wells loses money and the revenues produced by the properties are insufficient to cover the expenses and amounts due to investors.[90]  An analysis of the bank and brokerage accounts of Wells and the Relief Defendants shows that Wells has been operating a Ponzi scheme and paying interest and principal payments on Notes using other investor funds since at least 2020.[91]  Wells' cash flow does not support its business activity, resulting in net cash outflow of approximately

---

[84] *Id.* at ¶ 22.
[85] *Id.*
[86] *See, e.g.,* **Ex. 16** at ¶ 11; **Ex. 17** at ¶ 14.
[87] **Ex. 2** at ¶¶ 21-24 and 29.
[88] **Ex. 6** at ¶ 54.
[89] *See* **Ex. 2** at ¶¶ 24 and 29; **Ex. 16** at ¶ 11; **Ex. 17** at ¶ 14.
[90] *See* **Ex. 6** at ¶¶ 24-26 and Ex. E.
[91] *Id.*

$23 million.[92]   As such, Wells' operations are dependent on injections of new investor money and its operations are unsustainable.[93]   Moreover, from January 2020 to present, Defendants have diverted approximately $10 million of investor funds to make Ponzi-like interest payments to investors and to satisfy Note redemptions.[94]

### 4.  *Misuse of Investor Funds to Pay Sales Agents Undisclosed Commissions*

Contrary to the representations in the Assets-to-Income Program PPM section on "Selling Commissions and Discounts[,]" which advises that "Notes will be offered and sold by the Company's Management who will not receive remuneration in connection with the placement of Notes[,]" Wells used internal and external sales agents to solicit investors and used investor funds to pay sales agent commissions.[95]

Nowhere in the PPM, or any of the other offering or marketing materials, do Defendants disclose that percentage-based commissions, as high as 15%, are paid to independent sales agents in connection with the sale of the Notes.[96]   Nor did Defendants disclose that internal sales agents, who were paid hourly, also received percentage-based commissions on the value of the Notes sold to investors.[97]   From January 2020 to present, Wells paid commissions of approximately $6.8 million to outside sales agents, which came from investor funds.[98]

---

[92] *Id.* at ¶ 24.  This figure represents net cash outflow from January 2020 to present.  *Id.*
[93] *See id.* at ¶ 26.
[94] *See id.* at ¶ 18 and Tables 4 and 5.
[95] *See* **Ex. 2** at ¶¶ 4-19, 21-24, 26, and 29; **Ex. 3** at ¶¶ 5-19; **Ex. 6** at ¶¶ 20-21, 37, and Table 7.
[96] *See generally* **Exs. 3.A, 3.B,** and **3.D**; **Ex. 14**; **Ex. 15**.
[97] *See generally* **Exs. 3.A, 3.B,** and **3.D**; **Ex. 14**; **Ex. 15**.
[98] **Ex. 6** at ¶¶ 20 and 37, and Table 7.

### 5.   *Failure to Disclose Joseph's Role as Control Person*

Wells touts the business experience of its CEO Bingham, including that she "has successfully built a strong current portfolio over $100 [million]."[99]  Although Bingham holds herself out as the founder and CEO of Wells, she shares control and management of Wells with her husband, Joseph, a convicted fraud felon,[100] and undisclosed principal and control person of Wells and the Relief Defendants.[101]  In fact, according to one former employee, Joseph "made all the decisions."[102]  Among other things, Joseph actively participates in training and interviewing employees, including internal sales agents.[103]  Joseph organized and led weekly meetings with staff and meets with outside sales agents.[104]  Joseph also has an integral role in Wells' undisclosed options trading strategy, running Defendants' "trading room," and boasting to employees how trading is more lucrative than real estate.[105]

Despite being a control person of Wells and Relief Defendants, Joseph is not identified or disclosed on Wells' investor documents, the Assets-to-Income Program materials, the PPM, or Wells' website.[106]  To the contrary, when interacting with employees, sales agents and investors, Joseph attempts to hide his identity by using the first name "Jon" when his real first name is "Jean."[107]

Joseph's identity and involvement in Wells are likely hidden because he is a recently convicted felon who pleaded guilty in November 2019 to one count of wire fraud [18 U.S.C. §

---

[99] **Ex. 3.D** at p. 16 (PDF p. 56 of 74).
[100] *See* **Ex. 11**.
[101] **Ex. 2** at ¶¶ 7-8, 16, 20-23, and 25-29; *see also* **Ex. 3** at ¶ 11.
[102] **Ex. 2** at ¶ 25.
[103] **Ex. 2** at ¶¶ 7-8; *see also* **Ex. 3** at ¶ 11.
[104] **Ex. 2** at ¶¶ 16-19 and 21.
[105] *Id.* at ¶¶ 21-23.
[106] *See generally* **Exs. 3.A, 3.B,** and **3.D**; **Ex. 14**; **Ex. 15**.
[107] **Ex. 2** at ¶¶ 27-28.

1343] for misappropriating approximately $3 million while operating his business, Evergreen.[108] On March 17, 2020, the district court entered a criminal judgment against Joseph, sentencing him to fifteen months of imprisonment, and ordering him to pay $3,070,000 in restitution.[109]  On July 14, 2021, Joseph was given supervised release for three years and it appears to have been recently extended.[110]

### D. Defendants' Misappropriation of Investor Funds

From January 2020 to present, Defendants Bingham and Joseph, directly and indirectly, also misappropriated investor funds for themselves.   An analysis of Wells' and Relief Defendants' bank accounts—wholly controlled by Bingham—reveals that Bingham and Joseph used at least $1.8 million of investor funds for non-business personal expenses, including cash withdrawals, luxury cars, living expenses such as groceries,[111] and even settlement of a private lawsuit for $293,000.[112]   For example, Cambridge bank records show that on March 21, 2023, Joseph spent $60,228.23 at Tesla Motors.[113]

---

[108] *See* **Exs. 8, 10,** and **11.**

[109] **Ex. 11.**

[110] **Exs. 12** and **13.**

[111] **Ex. 6** at ¶ 58 and Table 13 (adding expenditures from 2020 to present), and Exhibit D.

[112] The details of this settlement payment are as follows.  The $293,000 was transferred from Relief Defendant Cambridge's Bank of America account ending in 1982 to Stuart N. Kaplan P.A. (Joseph's lawyers from his criminal case), who represented Joseph and Bingham in: *Amaltheia Capital, Ltd. v. Joseph*, S.D. Fla. Case No. 19-cv-62746. *See* **Ex. 5** at p. 5. The plaintiff, Amaltheia Capital, Ltd. ("Amaltheia") and its CEO **Gunnar** Engstrom, alleged that Joseph and his company, Evergreen, breached an earlier settlement agreement where they agreed to pay Amaltheia $1.75 million. *Amaltheia Capital, Ltd.*, S.D. Fla. Case No. 19-cv-62746, DE 1 at 1-4; *see also* DE 1-3 at 10 (showing Gunnar Engstrom as Amaltheia CEO).  On January 7, 2020, Amaltheia obtained a default judgment against Joseph for $1,669,000. *See id.* at DE 16. On January 15, 2021, during judgment collection efforts, Amaltheia filed a motion to implead Bingham as a fraudulent transferee, which was granted on June 2, 2021. *Id.* at DE 31 and 32. On August 5, 2021, Joseph and Bingham settled with Amaltheia and agreed to pay almost $1.7 million, or a "compromised discount" of almost $1.4 million if paid within 36 months. *Id.* at DE 38 at ¶ 4.  Less than two years later, a wire from Cambridge's account ending in 1982 was sent to Stuart N. Kaplan P.A., lawyer for Bingham and Joseph, for the aforementioned $293,000 with

In addition, on or about January 6, 2023, Wells, through Relief Defendant 930 Parkside LLC, purchased a residential house in West Palm Beach (the "WPB House") for $1.95 million.[114]  On August 10, 2023, just eight months after the purchase, 930 Parkside LLC quit-claimed the WPB House to Bingham in her personal capacity for $10.[115]

### E. Defendants Engaged in Unregistered Broker-Dealer Activity

During the Relevant Period, Defendants offered and sold securities issued by Wells under, among others, its Assets-to-Income Program, raising over $56 million from at least 660 investors.[116]  Bingham and Joseph played a significant role in Wells' offering and Ponzi scheme by hiring and training a team of internal sales agents, and by retaining a network of independent sales agents nationwide.[117]  Bingham and Joseph provided sales agents with offering materials, a marketing presentation, and all the tools necessary to pitch the Assets-to-Income Program, including arranging in-house sales agent trainings and leading weekly meetings with in-house sales agents.[118]  Wells paid at least $6,865,973 in commissions to independent sales agents, and Bingham and Joseph diverted millions for themselves.[119]

At all relevant times, Wells was not registered with the Commission as a broker-dealer.[120] At all relevant times, Bingham and Joseph held no securities licenses, were not registered with

---

the notation "*Gunnar* settlement."  *See* bank statements attached composite **Exhibit 18** at 6 (PDF p. of 7 of 17).  The next day, on March 7, 2023, Amaltheia filed a Satisfaction of Judgment. *Amaltheia Capital, Ltd.*, at DE 42.  Based on these facts, there is a powerful inference that Cambridge's funds were used to pay this civil lawsuit settlement for Bingham and Joseph.
[113] **Ex. 18** at p. 7 (PDF p. 8 of 17).
[114] **Ex. 1** at ¶ 8(b) and Ex. E (PDF pp. 478-82 of 485).
[115] *Id.*
[116] *See supra* Section IV.A-C.
[117] *See* **Ex. 2** at ¶¶ 7-27; **Ex. 3** at ¶¶ 5-18; *see also* **Exs. 3.A, 3.B,** and **3.D**.
[118] **Ex. 2** at ¶¶ 10-19.
[119] **Ex. 6** at ¶ 37.
[120] **Ex. 7** at ¶¶ 3-4.

the Commission, and were not associated with a broker-dealer registered with the Commission.[121]

### F. Relief Defendants Receive Investor Funds and Related Assets

The Relief Defendants are closely-held affiliated companies[122] through which Defendants purchased properties with Wells' investor funds.[123]  Many of the Relief Defendants also maintain or maintained bank accounts funded with investor funds, and maintain or maintained brokerage accounts funded with investor funds in which they traded securities.[124]  The Relief Defendants received investor funds for which they have no apparent legitimate claim.[125]

## V.   MEMORANDUM OF LAW

### A. The Standard for Obtaining an *Ex Parte* Asset Freeze

To obtain an *ex parte* asset freeze,[126] the Commission must establish: (i) that it is likely to succeed on the merits; (ii) that it or other interested persons are likely to suffer irreparable harm in the absence of preliminary relief; (iii) that the balance of the equities tip in favor of a freeze; and (iv) that the injunction is in the public interest.  *See Starbucks Corp. v. McKinney*, 144 S.Ct. 1570, 1575 (2024); *see also SEC v. Chappell*, 107 F.4th 114, 126 (3d Cir. 2024) (applying the same elements for an asset freeze in a Commission case); *see also Asset Recovery and Mgmt. Trust, S.A.*, 340 F. Supp. 2d at 1309-11 (same).  The Commission meets all four elements.

---

[121] *Id.* at ¶¶ 3, 5-6.
[122] *See supra* Section II.B.
[123] *See* **Ex. 1** at ¶¶ 3-5 and 7-9.
[124] **Ex. 6** at ¶¶ 10-15, 31-58, and Tables 1 and 2.
[125] *See id.* at ¶¶ 37-57.
[126] "Asset freezes may be appropriate in the context of securities cases … The Securities Act of 1933 and the Securities and Exchange Act of 1934 confer general equity powers upon district courts."  *SEC v. Asset Recovery and Mgmt. Trust, S.A.*, 340 F. Supp. 2d 1305, 1308 (M.D. Ala. 2004).  "When there is a showing of a securities law violation, the freezing of assets may be appropriate to ensure that the assets will be available to compensate public investors."  *Id.*

**B.** **The Evidence Establishes *Prima Facie* Violations of the Securities Laws and a Likelihood of Success on the Merits**

To establish a likelihood of success on the merits, the Commission "must demonstrate that it can win[,] … which requires a showing significantly better than negligible but not necessarily more likely than not" that Defendants violated the applicable federal securities laws. *Chappell*, 107 F.4th at 130. As explained below, the Commission exceeds this "significantly better than negligible standard" by providing substantial, compelling, and competent evidence that Defendants have violated antifraud provisions Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b-5 thereunder, and the broker-dealer registration provisions of Exchange Act Section 15(a). Additionally, Bingham and Joseph, as control persons of Wells under Exchange Act Section 20(a) are responsible for Wells' violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder. The Commission also shows that Relief Defendants have been unjustly enriched by receiving investor funds.

This "likelihood of success" argument is organized as follows. First, the Commission shows that the Notes qualify as securities—a common element for all of the Commission's antifraud claims—under two applicable tests: the *Reves* "note" analysis and the *Howey* "investment contract" analysis. Second, after establishing the Notes are securities, the Commission demonstrates another common element of each antifraud claim: the use of interstate commerce. Third, the Commission explains how Defendants have violated Securities Act Section 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5, which all share common elements. Fourth, the Commission establishes how Defendants have violated Exchange Act Section 15(a). Fifth, the Commission shows that Bingham and Joseph are control persons liable under Exchange Act Section 20(a). Last, the Commission argues that Relief Defendants have unjustly received investor funds, have been improperly enriched by receiving those investor

funds, and the Commission is likely to succeed on its unjust enrichment claims against the Relief Defendants.

### 1. The Notes Are Securities Under the Reves Note Analysis

Section 2(a)(1) of the Securities Act (15 U.S.C. § 77b(a)(1)) and Section 3(a)(10) of the Exchange Act (15 U.S.C.§ 78c(a)(10)) both define a "security" to include, among other things, any "note[.]" The Wells Notes qualify as securities under this definition.

The Supreme Court has held that every note, with a term of more than nine months, is presumed to be a security unless it bears a strong resemblance to a judicially created list[127] of non-security notes, or unless it should be added to the list. *Reves v. Ernst & Young*, 494 U.S. 56, 63-67 (1990); *see also SEC v. Complete Bus. Solutions Grp., Inc.* 538 F. Supp. 3d 1309, 1322 (S.D. Fla. 2021). A "note" is an instrument "that evidences a promise to pay a specified sum of principal and interest to the payee at a specified time. . ." *Sanderson v. Roethenmund*, 682 F. Supp. 205, 206 (S.D.N.Y.1988) (finding that international certificates of deposit are "notes" under the securities laws); *see also* Black's Law Dictionary (12th ed. 2024) (defining note and promissory note as follows: "note *n.* [17c] 1. A written promise by one party (the *maker*) to pay money to another party (the *payee*) or to bearer" and "promissory note [18c] An unconditional

---

[127] Wells' Notes do not "bear[] a strong resemblance," or any resemblance, to the "non-securities notes" list endorsed in *Reves*. The types of notes that are not securities are: (i) notes delivered in consumer financing, (ii) notes secured by a mortgage on a home, (iii) short-term note secured by a lien on a small business or some of its assets, (iv) note evidencing a "character" loan to a bank customer, (v) short-term notes secured by an assignment of accounts receivable, (vi) notes which simply formalizes an open-account debt incurred in the ordinary course of business, and (vii) notes evidencing loans by commercial banks for current operations. *Reves*, 494 U.S. at 65. In *Reves*, the Supreme Court describes a four-factor test to determine whether an instrument bears a "strong resemblance" to these items. *See id.* at 66-67. Because the Notes in no way resemble these "non-securities notes," the Commission will not analyze the four-factor test. However, the Commission reserves the right to do so if Defendants contend that the Notes are "non-securities notes" under the four-factor *Reves* test.

written promise, signed by the maker, to pay absolutely and in any event a certain sum of money either to, or to the order of, the bearer or a designated person") (emphasis in original).

Here, the Notes, which are written promises to pay specific amounts of principal and interest to investors, all have terms longer than nine months, and plainly fall under the Securities Act and Exchange Act definitions of a "note." As such, the Notes are securities. *See Complete Bus. Solutions Grp., Inc.* 538 F. Supp. 3d at 1322-28 (finding at dismissal stage that promissory notes were securities and rejecting defendants' attempt to overcome *Reves* presumption); *SEC v. Sky Group USA LLC*, No. 21-cv-23443, 2022 WL 309378, at *4-5 (S.D. Fla. Feb. 2, 2022) (same). The Notes are also securities for another reason: they qualify as "investment contracts" under the Supreme Court's *Howey* test.

### 2. The Notes are Securities Under the Howey Investment Contract Test

In addition to qualifying as securities under the *Reeves* "note" analysis, the Notes also qualify as "investment contracts," and therefore securities, under the Securities Act (15 U.S.C. § 77b(a)(1)) and Exchange Act (15 U.S.C.§ 78c(a)(10)). In *SEC v. W.J. Howey Company* and subsequent caselaw, the Supreme Court explained that an investment contract exists when there is: (a) an investment of money; (b) in a common enterprise; and (c) based on the expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999) (discussing investment contract test provided by Supreme Court in *SEC v. W.J. Howey Company*, 328 U.S. 293, 298-99 (1946) and *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975)). Wells' Notes satisfy all three prongs.

First, hundreds of people invested their funds by buying the Notes from Wells.[128]  This fact satisfies the first prong because "[a]ll that is required is that the investor give up some tangible and definable consideration."  *SEC v. Unique Fin. Concepts, Inc.*, 119 F. Supp. 2d 1332, 1337 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir. 1999).

Second, *Howey*'s common enterprise prong may be satisfied by vertical commonality. Vertical commonality exists where "the fortunes of investors are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1995, 1199 (11th Cir. 1999).  Vertical commonality requires only a finding that investors' "fortunes are inextricably tied to the efficacy of the promoter." *Id.*; *see also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005).  The Eleventh Circuit further instructs that the "thrust of the common enterprise test is that the investors have no desire to perform the chores necessary for a return." *Unique Fin. Concepts, Inc.*, 196 F.3d at 1200 (quoting *Eberhardt v. Waters*, 901 F.2d 1578, 1580-81 (11th Cir. 1990)).[129]

The Notes easily satisfy the vertical commonality test and show a common enterprise. For example, according to the PPM, investor profits were dependent on Wells' efforts.[130]

---

[128] *See supra* Section IV.B.

[129] Some other circuits apply the "more stringent concept of horizontal commonality" to the common enterprise prong.  *See Fin. Concepts, Inc.*, 196 F.3d at 1200 n.4.   However, the Eleventh Circuit uses the more "flexible" and less "stringent" vertical commonality test. *Id.*

[130] *See* **Ex. 3.D** at p. 1 (PDF p. 41 of 74) (stating Wells' objective for the Note offering: "The Company is a real estate acquisition and development company that focuses on identifying, acquiring, and managing value-added residential and commercial real estate assets in strategically targeted locations in the United States with a core focus on Florida and Texas. We seek to utilize the proceeds of this offering to invest in real estate properties and projects that provide opportunities for future appreciation and/or cash flow income….There can be no assurance any of these objectives will be achieved."); p. 6 (PDF p. 46 of 74) (providing that risks in Note investment include "[s]uccesful implementation of the Company's objectives" and the "[t]he skills of our key personnel and that of our Manager [Bingham.]"), and; p. 18 (PDF p. 58 of 74) ("The Managers shall exercise their best efforts and their ordinary and customary business judgment and practices in managing the affairs of the Company.")

Further, per its Asset-to-Income Program Presentation, investor involvement was limited to "lend[ing] funds" to Wells, which would then "acquire, develop, and revitalize Residential & Commercial Properties..."  According to Wells, their real estate "portfolio consist[s] of 80% income producing properties..."[131]  When purchasing the Notes, investor fortunes were evidently "tied to the efficacy of" Wells' efforts and investors had "no desire to perform the chores necessary for a return." *Unique Fin. Concepts, Inc.*, 196 F.3d at 1200.  In sum, it was Wells' job to generate the returns, and that fact establishes the common enterprise element of the *Howey* test.

The third and last prong of the *Howey* test overlaps with the second prong: whether investors had the expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See Unique Fin. Concepts, Inc.*, 196 F.3d at 1201 ("the crucial inquiry [for the third prong of the *Howey* test] is the amount of control that the investors retain under their written agreements.").  As explained above, per Wells' PPM, Asset-to-Income Program Presentation, and website, Wells undertook entrepreneurial and managerial efforts to generate profits for investors. *See Friendly Power Co. LLC*, 49 F. Supp. 2d at 1371 (finding third prong of *Howey* test met where defendant company "provided all the essential managerial efforts that would affect the failure or success of the franchises in which investors bought partnership units."); *Unique Fin. Concepts, Inc.*, 196 F.3d at 1201 (affirming district court's finding of third *Howey* prong where "investors retained no control over their investments" and contract gave defendant "sole discretion to use" investor funds).  Investors were not included in Wells' efforts to generate profits and did not manage its affairs.  As such, the Notes satisfy all prongs of the *Howey* investment contract test and are securities under the federal securities laws.

---

[131] *See* **Ex. 3.B** at 4-5 (PDF pp. 13-14 of 74); **Ex. 2.A** at 4-5 (PDF pp. 15-16 of 32).

### 3. Defendants Used Interstate Commerce

As described above, among other things, Wells markets the Notes via its company website.[132]  Wells also corresponded with sales agents via video conference[133] and had investors sign documents online via DocuSign.[134]   This conduct satisfies the interstate commerce requirement of the Securities Act and Exchange Act.  *SEC v. Spinosa*, 31 F. Supp. 3d 1371, 1376 (S.D. Fla. 2014) (providing that use of internet satisfied interstate commerce requirement of the Securities Act and the Exchange Act); *SEC v. GMC Holdings Corp.*, No. 6:08-cv-275-Orl-28KRS, 2009 WL 506872, at *4 (M.D. Fla. Feb. 27, 2009) (determining that using the internet to make material misrepresentations in connection with the sale of securities satisfies the interstate commerce requirement of the Exchange Act).

### 4. Defendants Violate Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5

Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act prohibit essentially the same type of conduct.  *See Fin. Concepts, Inc.*, 119 F. Supp. 2d at 1339.  The provisions are "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 78-79 (2019).  There is "considerable overlap" among the subsections of Exchange Act Section 10(b), Rule 10b-5, and Securities Act Section 17(a).  *Id.* at 1102.  Thus, the Supreme Court instructs that the same underlying conduct may establish a violation of more than one subsection. *Id.*

Section 17(a) of the Securities Act makes it unlawful in the "offer or sale" of securities to: (a) "employ any device, scheme, or artifice to defraud;" (b) "obtain money or property by means of any untrue statement of a material fact or any [material] omission;" or (c) "engage in

---

[132] *Supra* Section IV.A.
[133] **Ex. 3** at ¶ 11.
[134] **Ex. 17** at ¶¶ 6, 8; **Ex. 18** at ¶ 8.

any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1)-(3).  A showing of scienter is required under Section 17(a)(1), but Sections 17(a)(2) and (a)(3) require only a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980) ("It is our view, in sum, that the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).").

Section 10(b) of the Exchange Act and Rule 10b-5 render it unlawful, "in connection with the purchase or sale" of securities, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement or omission of material fact; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person.  17 C.F.R. § 240.10b-5; *see also* 15 U.S.C. § 78j(b).  Proof of scienter is required under Section 10(b) and Rule 10b-5.  *Aaron*, 446 U.S. at 695 ("Accordingly, we conclude that scienter is a necessary element of a violation of § 10(b) and Rule 10b-5.")

Unlike private securities actions, the Commission is not required to prove reliance or injury under Securities Act Section 17(a), Exchange Act Section 10(b), or Rule 10b-5. *See SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012) (omitting injury from elements of Commission enforcement claims and explaining that reliance "is not an element of a SEC enforcement action").

a)      *Defendants' Misrepresentations and Omissions*

As described above in Section IV.A-D, Defendants have made many misrepresentations to investors relating to their Note offering, and have failed to disclose material information necessary to make the statements made to investors not misleading.  First, Defendants claim that Bingham is the CEO and manager of Wells, but entirely omit that Joseph also controls and manages Wells.  Second, Defendants omit that Joseph has been convicted of wire fraud and has

been on supervised release.  Third, Defendants assure investors that they will use investor funds to acquire and develop real estate, but only a portion of investor funds are used for this purpose. Instead, Defendants spend investor funds on other undisclosed activities, including: (i) futures and options trading; (ii) paying commissions to sales agents; and (iii) paying "interest" and redemptions to investors with investor funds.  Indeed, Defendants do not disclose to investors that they operate a Ponzi scheme and that Wells' real estate portfolio does not generate sufficient revenue to support their operations or payments to investors.  Fourth, Defendants misrepresent the value of their real estate portfolio, which is likely not worth $450 million, and which is heavily mortgaged and subject to many foreclosure lawsuits.  Last, Defendants do not disclose to investors that Bingham and Joseph have misappropriated millions of investor funds for themselves, including transferring the WPB House, purchased with investor funds, to Bingham in her personal capacity.   In sum, Defendants have made many misrepresentations and omissions.

### b) *The Misrepresentations and Omissions Were Material*

A false statement or omission must be material for a defendant to be liable.  *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007).  The test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *Id.* (quoting *SEC v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir. 1982)).  In other words, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information."  *Morgan Keegan & Co., Inc.*, 678 F.3d at 1246 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)).

The law is clear that the misrepresentations Defendants made about the use of investor funds—and their failure to disclose that funds were diverted for other purposes and misappropriated by Bingham and Joseph—were material.

"Misrepresentations regarding the use of investors' funds are material." *SEC v. LottoNet Operating Corp.*, No. 17-21033-Civ, 2017 WL 6949289, *13 (S.D. Fla. Mar. 31, 2017) (report and recommendation), *adopted* 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017); *SEC v. Smart*, 678 F.3d.850, 857 (10th Cir. 2012) (affirming that misrepresentations and omissions about use of investor money was material); *see also SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978) (same); *U.S. v. Lochmiller*, 521 Fed. Appx. 687, 691-92 (10th Cir. 2013) (upholding conspiracy to commit securities fraud conviction because, among other things, defendant made material misrepresentations when he told investors he would use money for low-income housing but instead used it for personal gain).  Evidence of Defendants' misuse of investor funds is provided above in Sections IV.C, D, and F.

Next, Defendants' statements and omissions failing to disclose that they were operating a Ponzi scheme are material.  *See SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 492-93 (S.D.N.Y. 2002); *SEC v. Natural Diamonds Inv. Co.*, No. 9:19-CV-80633, 2019 WL 13277296, at *11-12 (S.D. Fla. May 28, 2019) (finding material false statements and omissions about non-disclosure of Ponzi payments).  Evidence of Defendants' Ponzi scheme is provided above in Section IV.C.3.

Additionally, Defendants' failure to disclose that they paid sales commissions to internal and external sales agents was material, particularly where, as here, Wells' PPM advised investors that management would "not receive remuneration in connection with the placement of the Notes." *SEC v. Alliance Leasing Corp.*, No. 98-CV-1810-J, 2000 WL 35612001 at *8-9 (S.D.

Cal. 2000), *aff'd* 28 Fed. Appx. 648 (9th Cir. 2002) ("reasonable minds could not differ that large commissions amount to 30 cents on every dollar invested are patently material."); *see Lottonet*, 2017 WL 6949289, at *14 ("Any reasonable investor would want to know that Defendants were not, as Defendants represented, spending investor funds to develop the Company, but were instead using 35 percent of investors' money to pay sales agents for soliciting their investments."). Evidence of Defendants' undisclosed commission payments to sales agents is provided above in Section IV.C.4.

Finally, Defendants' concealment of Joseph's role in the company and his criminal history is material. *See Complete Bus. Solutions Grp., Inc.*, 538 F. Supp. 3d at 1331-32 ("Reasonable minds could conclude that LaForte's criminal history was material to investors."); *SEC v. Prater*, 289 F. Supp. 2d 39, 52-53 (D. Conn. 2003) ("The failure to disclose anywhere on the website or in other materials any information about [defendant's] extensive criminal history, including convictions for fraud, could certainly constitute a material omission which a reasonable investor might view as important in deciding whether to trust their money with [defendant] or his company."). Evidence of Defendants' concealment of Joseph's role in the company and his criminal history is provided above in Section IV.C.5.

      c)     *Defendants' Scheme to Defraud*

Defendants perpetuated their scheme to defraud investors through their material misstatements and omissions discussed above. *See Lorenzo*, 587 U.S. at 78-81 ("dissemination of false or misleading material is easily an 'artful stratagem' or a 'plan,' 'devised' to defraud an investor); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

Defendants' scheme is apparent from the evidence presented above in Section IV.A-E. They falsely created the appearance that Bingham was in sole control of Wells. They hid Joseph, his criminal record, and his control of Wells, from investors. They misrepresented the value of Wells' real estate portfolio and profitability of its business. *See supra* Section IV.C.1. Defendants misrepresented that investor funds would be used to acquire and develop real estate when, in reality, they only used a fraction of investor funds to do so. *Id.* Instead, Defendants misused most of the investor funds they raised, including by operating a Ponzi scheme since 2020, engaging in speculative options and futures trading, and paying undisclosed, high commissions to sales agents. *See supra* Sections IV.C.2-4. Last, as explained above in Section IV.D, Defendants diverted investor funds for themselves by among other things: (i) making payments to Bingham and Joseph; (ii) paying settlement funds to resolve Joseph's civil lawsuit, in which Bingham was impleaded as a fraudulent transferee; and (iii) transferring the WPB House, purchased with investor funds, from Wells' subsidiary to Bingham in her personal capacity. *See SEC v. Zanford*, 535 U.S. 813, 821-22 (2002) (finding that misappropriation of client's securities for personal use evidences a scheme to defraud). Accordingly, there is ample evidence of a scheme to defraud.

             *d)*      <u>*Defendants Acted with Scienter*</u>

Scienter is a state of mind embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). Scienter for violations of Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act is established by "a showing of knowing misconduct or severe recklessness." *SEC v. Monterosso*, 756 F.3d 1326,

1335 (11th Cir. 2014) (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982)).[135]

Acting through Wells, Bingham and Joseph made misrepresentations and omissions to investors and their knowing misconduct is evident. Bingham and Joseph clearly had knowledge as to what representations were made to investors given that they trained sales agents, provided them with offering and marketing materials, and Joseph had weekly meetings with sales agents. *See supra* Section IV.C.5. Bingham and Joseph hid from investors Joseph's involvement and control over Wells, and his earlier wire fraud conviction. *Id.* Instead, they held out Bingham as Wells' CEO and touted her purported extensive experience building a real estate portfolio. *See supra* Section IV.A. Yet Bingham knew her husband, Joseph—who is a felon and used a different first name around employees and internal sales agents—was an integral control person of Wells. *See supra* Section IV.C.5.

As sole manager and signatory of Wells' bank and brokerage accounts (*see supra* Sections II.A and IV.C.2), Bingham also knew that most of the investor funds raised were not used to purchase real property, but rather, diverted to other, undisclosed uses. *See supra* Sections IV.C.1-3 Bingham opened over 30 brokerage accounts where she deposited over $28 million, and she authorized Joseph to trade in those accounts. *See supra* Sections II.A and IV.C.2. As CEO, Bingham had to know that Wells did not have a $450 million real estate portfolio, and that the company was not generating sufficient revenues to pay investors interest due pursuant to the Notes. *See supra* Sections IV.C.1 and IV.C.3.

As an undisclosed control person, Joseph also had knowledge of these facts. *See supra* Section IV.C.5. Joseph also knew, contrary to the statements Wells made to investors about the

---

[135] As described above, Sections 17(a)(2) and (3) of the Securities Act only require negligence, and not scienter.

use of their investments and profitability of Wells' real estate portfolio, that significant sums were improperly diverted to fund his speculative trading activities. *See supra* Section IV.C.2. Indeed, he admitted to at least one employee that Wells was raising funds *for trading*, and that there was "no reason to invest in real estate. Zero. There's zero reason to invest in real estate." *Id.*

Both Bingham and Joseph participated in their misappropriation of investor funds and assets, facts that were undisclosed to investors. *See supra* Section IV.D. They used $293,000 of investor funds to pay a settlement from an unrelated civil lawsuit against Joseph, and in which Bingham was impleaded as a fraudulent transferee. *Id.* Additionally, they used at least $1.8 million for personal, non-business expenses, including payments for cars and groceries. *Id.* They also purchased the WPB House with investor funds through an affiliated entity, and then transferred the home to Bingham in her personal capacity. *Id.* All of these acts, and many others to be shown at trial, establish scienter. Bingham and Joseph knew, or were severely reckless in not knowing, that their conduct was fraudulent.

Last, Bingham's and Joseph's scienter is imputed to Wells. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096 n.16 (2d Cir. 1972) (stating that knowledge of person is "imputed to the corporations which he controlled..."), *abrogated in part, with respect to unrelated disgorgement ruling, by Liu v. SEC*, 591 U.S. 71, 79-80 (2020); *see also In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999) (finding that the scienter of corporate officers is properly imputed to corporation).

In sum, there is substantial, compelling, and competent evidence of scienter by all Defendants, and the Commission has made a *prima facie* showing that Defendants have violated Securities Act Section 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5.

34

### 5.  *Defendants Are Violating Exchange Act Section 15(a)*

"Under Section 15(a)(1) of the Exchange Act, a broker or dealer must register with the SEC before it can use the mails or any instrumentality of interstate commerce to effect any transaction in the purchase or sale of a security." *SEC v. U.S. Pension Trust Corp.*, No. 07-22570-CIV, 2010 WL 3894082, at *21 (S.D. Fla. Sept. 30, 2010) (citing 15 U.S.C. § 78o). Section 15(a)(1) provides:

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).  "Section 3(a)(4)(A) of the Exchange Act defines 'broker' as a person 'engaged in the business of effectuating transactions in securities for the account of others.'" *U.S. Pension Trust Corp.*, 2010 WL 3894082, at *21 (quoting 15 U.S.C. § 78c(a)(4)).

Several factors are considered when determining "whether a person has acted as a broker[,]" including: (i) actively soliciting investors; (ii) advising investors as to the merits of an investment; (iii) acting with a "certain regularity of participation in securities transactions[;]" and (iv) receiving commissions or transaction-based renumeration.  *U.S. Pension Trust Corp.*, 2010 WL 3894082, at *21 (citing *SEC v. Corp. Relations Grp.*, No. 99-CV-1222, 2003 WL 25570113, at *17 (M.D. Fla. Mar. 28, 2003)).  Other factors considered are whether the alleged broker: (v) is an employee of the issuer; (vi) is selling, or previously sold, the securities of the issuer; (vii) is involved in negotiations between the issuer and investor; (viii) analyses the financial needs of the

issuer; (ix) recommends or designs financing methods; (x) discusses the details of securities transactions; and (xi) makes investment recommendations. *Id.* Importantly, the Commission is not required to prove scienter to establish violations of Section 15(a). *Corp. Relations Grp.*, 2003 WL 25570113, at *17 ("As correctly noted by the SEC, scienter is not required for Section 15(a) violations.") (citing *SEC v. Randy*, 38 F. Supp. 2d 657, 667 (N.D. Ill. 1999)).

Based on the facts established above, Wells, Bingham, and Joseph acted as unregistered brokers. Bingham opened brokerage accounts on behalf of Wells and several of the Relief Defendants. Bingham and Joseph then used approximately $28 million of investor proceeds to trade securities and lost approximately $12 million. *See supra* Section IV.C.2.

Bingham and Joseph also hired internal sales agents and contracted with external sales agents to solicit investors to purchase Wells' Notes, and Wells paid transaction-based commissions to those sales agents for the sale of Notes. They also communicated and met with prospective investors.[136] Given these facts, there is substantial, compelling, and competent evidence that Defendants have violated Exchange Act Section 15(a). *See supra* Section IV.C.4.

### 6. *Bingham and Joseph Are Control Persons Under Exchange Act Section 20(a)*

A person is liable as a control person under Section 20(a) if he or she "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. The Enstar Grp.*, 84 F.3d 393, 396 (11th Cir. 1986). "The text of section 20(a) unambiguously imposes derivative liability on persons that control primary violators of the [Exchange] Act." *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 721 (11th Cir. 2008). The Eleventh Circuit explained that "House

---

[136] *See* **Ex. 2** at ¶ 26.

of Representatives Report accompanying the Act summarized section 20(a) and clarified that Congress intended to achieve its purpose by making 'a person who controls a person subject to the act . . . liable *to the same extent* as the person controlled unless the controlling person acted in good faith.'" *Id.* at 721-22 (quoting H.R. Rep. No. 73-1383, at 26 (1934)) (emphasis in original).

Both Bingham and Joseph are control persons. Bingham is the public facing founder and CEO of Wells.[137] The PPM, Asset-to-Income Program Presentation, and company website all indicate that Bingham controlled Wells.[138] Presumably because of his criminal history, Joseph was a hidden control person. However, despite his hidden role, and as detailed in the declaration of Wells' former employee, Joseph plays a critical role as a control person: (i) he interviewed at least one candidate for a job at Wells; (ii) he arranged trainings of Wells internal sales agents; (iii) he held weekly meetings with Wells staff; (iv) he traded securities for Wells; (v) he explained to staff that there was "no reason" to invest in real estate because of the low or negligible profits and he could "double that money" by trading securities for Wells; and (vi) he made behind the scenes decisions for Wells, even though Bingham was the face of the company.[139] Further, according to a former employee, Joseph "made all the decisions."[140]

Based on the evidence presented, both Bingham and Joseph, directly and indirectly, controlled Wells' corporate policies and activities, and both are liable for derivative control person liability under Exchange Act Section 20(a) for Wells' violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder. *See SEC v. Huff*, 758 F. Supp. 2d 1288, 1344-46 (S.D. Fla. 2010) (imposing Section 20(a) liability on control person who, among other things, was

---

[137] *See, e.g.,* **Ex. 3** at ¶¶ 5, 11-17; **Ex. 3.D** at pp. 16 (PDF p. 56 of 74), 17 (PDF p. 57 of 74), 18-19 (PDF pp. 58-59 of 74).
[138] *See generally* **Exs. 3.A, 3.B,** and **3.D**; **Ex. 14**; and **Ex. 15**.
[139] **Ex. 2** at ¶¶ 7-8 and 16-29.
[140] *Id.* at ¶ 25.

described as "puppet master" at the "dead center" of the "very tight group of people" controlling the entity, to whom others in the entity deferred, and who controlled company cash flow).

### 7. *Relief Defendants Have Received Investor Funds*

As explained above in Sections II.B and IV.C-F, Relief Defendants are closely held corporations, controlled by Wells and Bingham, that have obtained investor funds by: (i) owning real estate purchased with investor funds; (ii) operating bank accounts that received investors funds; and (iii) operating brokerage accounts that traded with investor funds. The Relief Defendants do not have legitimate claims to those funds or assets, and it is not just, equitable, or considerable for the Relief Defendants to retain those funds under the circumstances. The Court's power to freeze assets extends to relief defendants. *See SEC v. Cavanagh*, 155 F.3d 129, 136-37 (2d Cir. 1998) (affirming freeze order against relief defendant); *CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010) (discussing SEC and CFTC enforcement action involving asset freeze of relief defendant's assets); *CFTC v. Int'l Berkshire Grp. Holdings, Inc.*, No. 05-61588, 2006 WL 3716390, at *10 (S.D. Fla. Nov. 3, 2006) ("A district court may freeze the assets of relief defendants.") (citing *CFTC v. Kimberlynn Creek Ranch*, 276 F.3d 187, 193 (4th Cir. 2002)).

### 8. *The Commission Has Established a Likelihood of Success on the Merits*

The analysis above shows that the Commission is likely to succeed on the merits on its claims for violations of Securities Act Section 17(a), Exchange Act Sections 10(b), 15(a), 20(a),[141] and Exchange Act Rule 10b-5. The Commission also establishes that the Relief Defendants have been unjustly enriched by the receipt of investor funds, and that it will prevail on its unjust enrichment claim. Indeed, the Commission has met and exceeded the "significantly better than negligible standard" by supplying substantial, compelling, and competent evidence

---

[141] The Commission brings the Exchange Act Section 20(a) claims only against Bingham and Joseph.

that Defendants have violated antifraud provisions and that the Commission can win this case. *See Chappell*, 107 F.4th at 130.

### C. **The Commission's Evidence Establishes the Likelihood of Irreparable Harm**

Irreparable harm can be shown when there is "good cause to believe that, unless funds and assets are frozen ... [the Defendants] will dissipate, conceal, or transfer from the jurisdiction of th[e] Court assets that could be subject to an order directing disgorgement or the payment of civil money penalties[.]" *Id.* at 138. It can also be shown when the defendant "spends lavishly" because "assets needed for disgorgement may well also be dissipated without an asset freeze." *Id.*

For several reasons, there is a substantial likelihood of irreparable harm if an asset freeze is not entered against Bingham and Joseph. First, Defendants have operated a multi-year fraudulent securities offering and Ponzi scheme, and have misused and misappropriated many millions of investor funds. There is no reason to believe Defendants would stop their inappropriate conduct without an asset freeze. Second, Joseph is a convicted fraud felon who perpetrated this Ponzi scheme, with the help of his wife Bingham, while he was on Court ordered supervised release. This brazen conduct shows a propensity to violate the law (with Bingham's help), and that Defendants are capable of dissipating and concealing investor funds as this lawsuit is progressing. Indeed, even recently Bingham has transferred Wells funds to herself and for Defendants' benefit.[142] Third, both Bingham and Joseph have substantial international ties and may be capable of transferring funds from the jurisdiction. Bingham claims to have "extensive experience working abroad in Ecuador, Taiwan, France, and Thailand" and that she

---

[142] *See* Bank of America documents attached as **Exhibit 19** showing: June 28, 2024 $1,000 transfer to Bingham (PDF p. 7 of 9); July 5, 2024 $5,000 and $2,000 transfers to Bingham (PDF p. 9 of 9); July 5 and 8, 2024, payments to Comcast in the amounts of $164.51 and $305.52 (*id.*).

"speaks fluent Spanish and French."[143]  Joseph also has international ties.  He is from Haiti[144] and has conducted significant international business as evidence by his earlier lawsuits.[145]  Last, Defendants have spent millions of investor funds on personal expenditures and have transferred the $1.9 million WPB House from one of the relief defendants to Bingham.[146]

Given these facts, the Commission has established that there is a substantial likelihood of irreparable harm if an asset freeze is not entered.  *See Chappell*, 107 F.4th at 138 (finding that Commission established irreparable harm where defendant's propensity to violate federal securities law made the court "wary that [defendant] would also, but for [the asset freeze], seek to conceal assets to avoid a potential future order directing him to disgorge..."); *see also Asset Recovery and Mgmt. Trust, S.A.*, 340 F. Supp. 2d at 1311 (finding irreparable harm when the "absence of an [asset freeze] would allow [defendants] to further dissipate any equitable remedy available to defrauded investors, causing investors irreparable harm.").

### D.  The Balance of the Equities Tip Heavily in the Commission's Favor

When considering the equities, the Court must "balance the parties' relative harms; that is the potential injury to the plaintiffs without this [asset freeze] versus the potential injury to the defendant with it in place."  *Chappell*, 107 F.4th at 138-39 (quoting *Issa v. Sch. Dist. Of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).  The Court should "also consider the possibility of harm to other interested persons from the grant or denial" of the asset freeze.  *Chappell*, 107

---

[143] **Ex. 3.B** at p. 12 (PDF p. 21 of 74); *see also* **Ex. 3.D** at p. 16 (PDF p. 56 of 74) (indicating that Bingham "worked abroad in Taiwan and Thailand before settling in South Florida...").
[144] **Ex. 2** at ¶ 28.
[145] *See generally* **Ex. 8** and **Ex. 9**; *see also Amaltheia Capital Ltd. v. Joseph*, S.D. Fla. Case No. 19-cv-62746, DE 1 (alleging that Joseph did business with plaintiff, a foreign corporation, and breached agreement with plaintiff).
[146] *See supra* Section IV.D.

F.4th at 139 (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2019)). The equities clearly favor an asset freeze.

There is a "well-settled" legal principle "that a wrongdoer may not benefit from his [or her] own fraud[.]" *Asset Recovery and Mgmt. Trust, S.A.*, 340 F. Supp. 2d at 1308 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). This principle shows that the equities heavily favor the entry of an asset freeze. Without the freeze, the Defendants, who have violated the antifraud provisions of the securities laws and defrauded hundreds of investor victims, could continue to benefit from their fraud at the expense of investors. On the other hand, entering a freeze would prevent further harm to investors and preserve assets. The equities strongly favor protecting the investors, even if the Defendants are inconvenienced by the freeze. Indeed, the *Asset Recovery and Management Trust, S.A.* ruling applies equally to this case: "the threatened harm to the investors outweighs any harm that the [asset freeze] may cause [Defendants]; while [Defendants] will suffer from their inability to access their resources, they may move the court to modify the order to provide for their living expenses." *Asset Recovery and Mgmt. Trust, S.A.*, 340 F. Supp. 2d at 1311.

**E.   The Asset Freeze Is in the Public's Interest**

As a general proposition, "[i]t is in the public interest to protect against fraud and to make victims of fraud whole, while preventing wrongdoers from benefiting from their deceit." *Asset Recovery and Mgmt. Trust, S.A.*, 340 F. Supp. 2d at 1311 (finding asset freeze was in the public's interest). Moreover, in enacting the securities laws, Congress expressed the importance of those laws in protecting investors. *See, e.g.,* Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] (granting the Commission the power to create rules, relating to the purchase and sale of securities, which it deems "necessary or appropriate in the public interest or for the protection of

investors"); *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968) (providing that the regulation under, among others, Section 15(a) of the Exchange Act is "of the utmost importance in effecting the purposes of the [Exchange] Act" because provides "some discipline … over those who may engage in the securities business and … standards may be established with respect to training, experience, and records."). In other words, enforcing the federal securities laws to stop and prevent fraud is in the public interest.

Moreover, "if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Chappell*, 107 F.4th at 139 (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)). Given that the Commission has convincingly established both the likelihood of success on the merits and irreparable injury, the public interest "favors the [Commission]" and the asset freeze. *See Chappell*, 107 F.4th at 139.

Accordingly, the Commission meets all four elements necessary for an asset freeze.

**F.  A Total Asset Freeze Is Appropriate**

Given the circumstances, the Commission requests a total asset freeze for Wells, Bingham, Joseph, and the Relief Defendants. Of the $56 million of investor funds received by Defendants and Relief Defendants, at least $28 million was diverted and used for speculative options trading, resulting in around $12 million in losses of investor funds. Millions more were misused to pay high commissions to sales agents and were misappropriated by Bingham and Joseph. The properties held by Wells and the Relief Defendants also appear to be heavily mortgaged, and no fewer than six foreclosure actions have been filed due to non-payment. The Commission has also provided evidence that Bingham and Joseph are control persons under Section 20(a) of the Exchange Act, and they would therefore "also be liable jointly and several with and to the same extent as" Wells. 15 U.S.C. § 78t(a). As such, a total freeze is appropriate.

If, in fact, Defendants and/or Relief Defendants have more liquid assets than the amount of their ultimate liability, the freeze can be appropriately adjusted. Accordingly, the Commission requests a total asset freeze against Defendants and Relief Defendants.

### G. Sworn Accountings Are Necessary and Appropriate

The Court should require Wells, Bingham, and Joseph to file sworn accountings, which enables the Commission and the Court to determine their profits, the present location of proceeds, and their ability to repay. *See SEC v. BKCoin Mgmt., LLC*, No. 23-20719-CIV, DE 9, at *3-4 (S.D. Fla. Feb. 24, 2023) (ordering sworn accounting); *SEC v. PreIPO Corp.*, No. 23-81141-CIV, DE 10, at *6-7 (S.D. Fla. Aug. 15, 2023) (same); *SEC v. Tannenbaum*, No. 99-CV-6050, 2007 WL 2089326, *4 (E.D.N.Y. July 19, 2007) (same).

### H. An Order Prohibiting Record Destruction Is Necessary and Appropriate

Given the circumstances and Defendants' misconduct, and history of misconduct, the Court should enter an order prohibiting Defendants and Relief Defendants from destroying records to prevent the destruction of documents before this Court can adjudicate the Commission's claims, and to ensure that whatever equitable relief might ultimately be appropriate is available. *See SEC v. Shiner*, 268 F. Supp. 2d 1333, 1345-46 (S.D. Fla. 2003) (ordering records preservation); *LottoNet Operating Corp.*, 2017 WL 6989148, at *6 (same); *BKCoin Mgmt., LLC*, No. 23-20719-CIV, DE 9, at *4 (same). The order should also require Defendants and Relief Defendants to preserve all records in their possession.

## IV.   CONCLUSION

WHEREFORE, the Commission requests that the Court:

i.  grant this motion;

ii.  enter an order substantially in the form submitted with this motion as **Exhibit 20** that:

1. freezes the assets of Defendants Wells, Bingham, Joseph, and the Relief Defendants;

2. orders Defendants Wells, Bingham, and Joseph to each file sworn accountings;

3. orders Defendants Wells, Bingham, Joseph, and Relief Defendants to preserve all records, and prohibits Defendants and Relief Defendants from destroying any records relating, in any way, to Wells, Bingham, Joseph, the Relief Defendants, to any investor or investment in Wells, and to any of the events described in this motion or in the Complaint filed in this case;

4. schedules a show cause hearing so that Defendants have the opportunity to argue and explain that this relief is inappropriate; and

5. retains jurisdiction over this matter to implement and carry out the terms of such order, and to continue to preside over this lawsuit.

iii. and grant any additional and further relief that the Court deems just.

## LOCAL RULE 7.1(D) CERTIFICATION

After reviewing the facts and researching applicable legal principles, I certify that this motion presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions. A ruling is requested as soon as possible, and preferably within the next five business days, and at the same time as a ruling on the Commission's contemporarily filed Emergency *Ex Parte* Motion and Memorandum of Law for Appointment of Receiver. An emergency ruling is necessary to prevent the further dissipation of investor assets and to represent the interests of investors in several pending state court foreclosure actions against Wells, Bingham, and certain Relief Defendants.

44

Dated: August 12, 2024          Respectfully submitted:


                                By: _____
                                Brian Lechich, Esq.
                                Florida Bar No. 84419
                                Email: LechichB@sec.gov
                                Phone: (305) 416-6257

                                Attorney for Plaintiff
                                **SECURITIES AND EXCHANGE**
                                **COMMISSION**
                                801 Brickell Avenue, Suite 1950
                                Miami, FL 33131
                                Telephone:  (305) 982-6300
                                Facsimile:   (305) 536-4154