## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 24-80980-CV-MIDDLEBROOKS

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

vs.

WELLS REAL ESTATE INVESTMENT, LLC,
JANALIE C. JOSEPH
A/K/A JANALIE C. BINGHAM, and
JEAN JOSEPH,

       Defendants.

CAMBRIDGE REAL ESTATE MANAGEMENT, LLC,
60 YACHT CLUB, LLC, 112 SOUTH OLIVE, LLC,
791 PARKSIDE HOME, LLC, 910 PARKSIDE, LLC,
930 PARKSIDE, LLC,
976 PALM BEACH SQUARE, LLC,
1070 BOCA RATON SQUARE, LLC,
2082 PARADISE PALM, LLC,
2295 CORPORATE BLVD LLC, 4050 NW, LLC,
4100 HOSPITAL OFFICE, LLC, 4800 FEDERAL, LLC,
7352 VALENCIA, LLC, 7483 VALENCIA, LLC,
BOCA DEERFIELD PROPERTIES, LLC,
DAYBREAK HOME, LLC,
GLOBE OFFICES, LLC, GLOBE PROPERTY OFFICES, LLC,
LW SQUARE OFFICE, LLC,
MARTINIQUEÂ INVESTMENTS LLC
a/k/a MARTINIQUE'S INVESTMENTS LLC,
OAKLAND LAND PROPERTY, LLC, and
SOUTH OLIVE OFFICE, LLC,

       Relief Defendants.
_____/

## RECEIVER'S FIRST INTERIM STATUS REPORT

Andres Rivero, as receiver (the "Receiver") for Wells Real Estate Investment, LLC, and relief defendants Cambridge Real Estate Management, LLC, 60 Yacht Club, LLC, 112 South Olive, LLC, 791 Parkside Home, LLC, 910 Parkside, LLC, 930 Parkside, LLC, 976 Palm Beach Square, LLC, 1070 Boca Raton Square, LLC, 2082 Paradise Palm, LLC, 2295 Corporate Blvd. LLC, 4050 NW LLC, 4100 Hospital Office, LLC, 4800 Federal, LLC, 7352 Valencia, LLC, 7483 Valencia, LLC, Boca Deerfield Properties, LLC, Daybreak Home, LLC, Globe Offices, LLC, Globe Property Offices, LLC, LW Square Office, LLC, Martiniqueâ Investments, LLC a/k/a Martinique's Investments LLC, Oakland Land Property, LLC, and South Olive Office, LLC, (collectively, the "Receivership Defendants") files his First Interim Status Report setting forth his activities and efforts to fulfill his duties under the Order under which he was appointed for the period from the date of appointment through September 30, 2024 (the "Reporting Period").

**Table of Contents**

I.      INTRODUCTION ...................................................................................... 1

II.     BACKGROUND ...................................................................................... 1

   A.   Procedural Background ...................................................................... 1

   B.   Factual Background ............................................................................ 2

      ii.   Misuse of Investor Funds ............................................................ 4

III.    RECEIVERSHIP ENTITIES ................................................................. 5

   A.   Receivership Defendants ..................................................................... 5

   B.   Additional Receivership Entities ....................................................... 8

IV.     ACTIONS TAKEN BY THE RECEIVER DURING THE REPORTING PERIOD  9

   A.   Employment of Professionals .............................................................. 9

   B.   Recovering Receivership Defendants' Records and Funds in Various Bank and Brokerage Accounts .................................................................. 10

   C.   Securing Real Properties ................................................................... 15

      i.    Management of Properties ......................................................... 15

      iii.   The Commercial Properties ....................................................... 16

      iv.   The Residential Properties ......................................................... 19

      v.    The Vacant Properties ................................................................ 20

      vi.   Oakland Land Property .............................................................. 20

      vii.  The 930 Parkside Property ........................................................ 21

      viii. The Martinique Property ........................................................... 22

      ix.   JCB Trent Property .................................................................... 22

   D.   Securing Personal Property ............................................................... 23

V.      FINANCIAL AFFAIRS ......................................................................... 25

   A.   Financial Accounts ............................................................................ 25

      i.    Receivership Defendants' Bank of America Accounts ............... 26

      ii.   Receivership Defendants' Merrill Lynch Accounts ................... 26

      iii.  Receivership Defendants' Chase Account .................................. 26

      iv.   Receivership Defendants' Wells Fargo Accounts ..................... 27

      v.    Receivership Defendants' Brokerage Accounts ........................ 28

   B.   The Receivership Defendants' Business Operations ......................... 28

VI.     LITIGATION ........................................................................................ 31

**A.** **Ongoing Legal Proceedings Involving the Receivership Defendants**........................ 31

**B.** **The Estate's Potential Claims against Third Parties** .................................................. 33

**VII.** **ADMINISTRATION OF RECEIVERSHIP ESTATE** ............................................... 33

**A.** **The Receiver and His Professionals** ........................................................................... 34

**B.** **Cash on Hand and Administrative Expenses** ............................................................. 35

**C.** **Claims**............................................................................................................................. 35

**D.** **Communications** ........................................................................................................... 36

   **i.** **Investor Communications** ....................................................................................... 36

   **ii.** **Communications with Lenders, Creditors, and Other Interested Parties** ............ 36

**E.** **Recommendations** ........................................................................................................ 37

## I.     INTRODUCTION

Since his appointment, the Receiver has worked diligently with counsel for the Securities and Exchange Commission (the "SEC"), Janalie Bingham, and counsel for Jean Joseph to identify and marshal all known assets and records of the Receivership Defendants, including funds held at multiple bank account and investment accounts, bank records, financial records, and to take control and secure all known real property of the Receivership Defendants and all known personal property of the Receivership Defendants having significant value. An inventory of all known assets the Receiver has marshalled to date is attached as **Exhibit A.**

## II.     BACKGROUND

### A. Procedural Background

On August 13, 2024, the Securities and Exchange Commission ("SEC") filed a Complaint for Injunctive and Other Relief [ECF NO. 1] ("Complaint") in the United States District Court for the Southern District of Florida against individual defendants Janalie Joseph A/K/A Janalie C. Bingham ("Bingham") and Jean Joseph ("Joseph") and the Receivership Defendants (collectively referred to as the "Defendants"), alleging that Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15U.S.C. 77q(a)], Section10(b) of the Exchange Act of 1934 ("Exchange Act") [15U.S.C. 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. 249.10b-5], and Section 15(a) of the Exchange Act [15 U.S.C. 78o(a)]. The case was assigned to the Honorable Donald M. Middlebrooks.

The SEC also filed its Emergency Ex Parte Motion and Memorandum of Law in Support of Appointment of Receiver [ECF NO. 5] and its Emergency Ex Parte Motion and Memorandum of Law for Asset Freeze and Other Relief [ECF NO. 6], seeking emergency relief including the entry of a permanent asset freeze and the appointment of a receiver.

On August 14, 2024, the Court entered an Order granting the SEC's Emergency Ex Parte Motion and Memorandum of Law for Appointment of Receiver [ECF NO. 11] ("Receivership Order") and an Order granting the SEC's Emergency Ex Parte Motion for Asset Freeze and Other Relief [ECF NO. 12] ("Asset Freeze Order"). Among other things, the Receivership Order appointed Andres Rivero as Receiver over the Receivership Defendants. The Asset Freeze Order placed a temporary injunction against all Receivership Defendant owned bank and brokerage accounts.

Additionally, the SEC sought the entry of a preliminary injunction. On September 16, 2024, there was a show cause hearing with the Court, during which the defendants were given an opportunity to state their objection against the entry of a preliminary injunction. No objections were made and subsequently on September 17, 2024, the Court entered an Order Granting Preliminary Injunction [ECF NO. 65] ("Preliminary Injunction"), expanding the temporary injunction previously entered in the Asset Freeze Order.

### B.  Factual Background

According to the Complaint, Bingham and Joseph orchestrated a scheme that involved offering and selling securities issued by Wells under, among others, its Assets-to-Income Program. Specifically, in the Complaint the SEC accused defendants of making material misrepresentations to investors in connection with the offering of promissory notes in exchange for funding to acquire and develop real estate, misusing and misappropriating investor funds to pay commissions to undisclosed sales agents, and diverting millions of dollars of investor funds to brokerage firms to be traded in highly speculative futures and options markets.

### i.      *Assets-to-Income Program*

Wells, through Bingham and Joseph, solicited investors by marketing its Assets-to-Income program (the "Program") on its website and other marketing materials, as purporting to be "designed with the purpose of adding value to existing residential and commercial assets and zoned parcels of land to be used as long-term revenue-generating properties." Investors who were solicited to invest in the Program were given three options of promissory notes: (1) an 18-month Note paying 1% interest per month, paid monthly, and return of principal at the end of the term; (2) a 28-month Note paying 1% interest per month, paid monthly, with a 1% bonus paid at maturity along with the return of principal; and (3) a 36-month Note without monthly interest payments, but payment of 99% interest at the end of the term, with principal repayment. Wells further advertised the Program as being profitable, claiming that investors would have the opportunity to generate cash flow on a monthly or annual basis through high returns on interest.

Joseph and Bingham also solicited investors to purchase the notes through a network of sales agents who were hired to sell the promissory notes to investors and paid hourly salaries and commissions for each note that was sold. Bingham and Joseph provided sales agents with marketing materials, including the Wells' Private Placement Memorandum ("PPM"). The PPM primarily represented to investors that proceeds from the sale of promissory notes would be used by Wells to purchase investment interest in real properties. Bingham and Joseph instructed the sales agents to use the PPM and other marketing materials to assure investors of the security of the promissory notes they were purchasing and the Program.

Moreover, using Wells' website, defendants made material misrepresentations and failed to disclose material information to investors related to the Program including: (1) the size,

security, and profitability of Wells' real estate portfolio; (2) the use of investor funds for speculative trading; (3) the use of investor funds to make payments to other investors; (4) the use of investor funds to pay sales agents; and (5) Joseph's— a prior convicted felon— involvement in controlling and managing Wells.

The Complaint alleges that through the Program defendants raised at least $56 million dollars from approximately 660 investors.

### ii.    *Misuse of Investor Funds*

According to the Complaint, Bingham and Joseph misappropriated millions of dollars of investor funds for their own personal use. Bingham controlled several of the Receivership Defendants' bank accounts. An analysis of these accounts dating back to January 2020 revealed that at least $1.8 million dollars of investor funds were used for Bingham and Joseph's personal expenses, including cash withdrawals, jewelry, luxury cars, living expenses such as groceries, and even towards settling private lawsuits. Additionally, Bingham and Joseph used investor funds to purchase personal property for their own use. For example, Wells, through 930 Parkside purchased a residential house located in Boca Raton for $1.95 million dollars. Then, just eight months after the purchase, 930 Parkside quit-claimed the house to Bingham in her individual capacity.

Moreover, the Complaint alleges that Bingham—who had sole signatory authority over the Receivership Defendants' bank accounts— opened at least 42 brokerage accounts in the name of several Receivership Defendants. These brokerage accounts were funded through the diversion of approximately $28 million dollars of the investors' monies and Joseph engaged in securities trading in those accounts. Specifically, Joseph, through the Receivership Defendants, engaged in speculative futures and options trading. The SEC has alleged that approximately $12

million dollars of investor funds were lost because of the defendants speculative securities trading activity.

### III.   RECEIVERSHIP ENTITIES

#### A.   Receivership Defendants

**Wells Real Estate Investment, LLC ("Wells")**, is a Wyoming limited liability company formed in 2017 with its principal place of business in West Palm Beach, Florida. Wells acquires, sells, borrows against, and manages commercial and residential real estate, including through the other Receivership Defendants. Additionally, Bingham opened multiple online brokerage accounts in Wells' name, and investor funds were transferred to those accounts for speculative trading.

**Cambridge Real Estate Management, LLC ("Cambridge")**, is a Florida limited liability company, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member. Cambridge manages properties owned by Wells and its affiliates. Bingham opened multiple online brokerage accounts in Cambridge's name, and investor funds were transferred to those accounts for speculative trading.

**4100 Hospital Office, LLC ("4100 Hospital")**, is a Florida limited liability company formed in March 2019, with its principal place of business in West Palm Beach, Florida. Wells is its manager, and Bingham is its registered agent.

**60 Yacht Club, LLC ("60 Yacht Club")**, is a Florida limited liability company formed in May 2021, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member. Bingham opened multiple online brokerage accounts in 60 Yacht Club's name, and investor funds were transferred to those accounts for speculative trading.

**112 South Olive, LLC ("112 South Olive")**, is a Florida limited liability company formed in August 2022, claiming to have its principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**791 Parkside Home, LLC ("791 Parkside")**, is a Florida limited liability company formed in July 2021, claiming to have its principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**910 Parkside, LLC ("910 Parkside")**, is a Florida limited liability company formed in August 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**930 Parkside, LLC ("930 Parkside")**, is a Florida limited liability company formed in August 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**976 Palm Beach Square, LLC ("976 Palm Beach")**, is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming. Wells is its authorized member.

**1070 Boca Raton Square, LLC ("1070 Boca")**, is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming. Wells is its authorized member. Bingham opened multiple online brokerage accounts in 1070 Boca's name, and investors funds were transferred to those accounts for speculative trading.

**2082 Paradise Palm, LLC ("2082 Paradise Palm")**, is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming. Wells is its authorized member.

6

**2295 Corporate Boulevard, LLC ("2295 Corporate Blvd"),** is a Florida limited liability company formed in December 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**4050 NW LLC ("4050 NW"),** is a Florida limited liability company formed in December 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**4800 Federal, LLC ("4800 Federal"),** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member. Bingham opened multiple online brokerage accounts in 4800 Federal's name, and investor funds were transferred to those accounts for speculative trading.

**7352 Valencia, LLC ("7352 Valencia"),** is a Florida limited liability company formed in June 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**7483 Valencia, LLC ("7483 Valencia").** is a Florida limited liability company formed in May 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**Boca Deerfield Properties, LLC ("Boca Deerfield"),** is a Florida limited liability company formed in September 2022, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**Daybreak Home, LLC ("Daybreak"),** is a Florida limited liability company formed in December 2017, claiming to have a current principal place of business in Cheyenne, Wyoming. Wells is its authorized member.

**Globe Offices, LLC, ("Globe Offices")**, is a Florida limited liability company formed in June 2019, with a principal place of business in West Palm Beach, Florida. Wells is its authorized member. Bingham opened multiple online brokerage accounts in Globe Offices' name, and investor funds were transferred to those accounts for speculative trading.

**Globe Property Offices, LLC ("Globe Property"),** is a Florida limited liability company formed in May 2019, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**LW Square Office, LLC ("LW Square")**, is a Florida limited liability company formed in July 2018, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member. Bingham opened multiple online brokerage accounts in LW Square's name, and investor funds were transferred to those accounts for speculative trading.

**Martiniqueâ Investments, LLC a/k/a Martinique's Investments, LLC ("Martinique")**, is a Florida limited liability company formed in October 2020, with a principal place of business in West Palm Beach, Florida. Bingham is its manager.

**Oakland Land Property, LLC ("Oakland Land Property")**, is a Florida limited liability company formed in September 2021, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**South Olive Office, LLC ("South Olive")**, is a Florida limited liability company formed in August 2021, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its authorized member.

**B.  Additional Receivership Entities**

**Boca Square One, LLC ("Boca Square"),** is a Florida limited liability company, claiming to have a current principal place of business in Las Vegas, Nevada. Wells is its

authorized member. Boca Square owns a residential property located at 100 Southwest 15th Court, Boca Raton, FL 33486. The mortgage lender has initiated foreclosure proceedings against the property. Although Boca Square is not named as a defendant in the SEC's Complaint, the Receivership Order stays all proceedings involving the Receivership Defendants, including any and all of its subsidiaries. *See* Receivership Order at ¶ 26. Because Boca Square is a subsidiary of Wells, the Receiver has stayed the foreclosure action against the Boca Square property.

## IV.   ACTIONS TAKEN BY THE RECEIVER DURING THE REPORTING PERIOD

### A.  Employment of Professionals

Immediately upon his appointment and review of relevant documents and discussions with counsel for the SEC, the Receiver conducted necessary planning and determined his need to employ certain professionals to assist him in carrying out his duties and responsibilities under the Receivership Order. Accordingly, the Receiver filed his application to hire Rivero Mestre, LLP ("Rivero Mestre") as his counsel [ECF NO. 14], and his application to hire EisnerAmper LLP ("EisnerAmper") as his forensic accounts [ECF NO. 59] (collectively referred to as the "professionals"). The foregoing professionals have been instrumental to the Receiver's success in this case thus far, helping him with marshalling and securing the various Receivership Defendants' assets, identifying and seeking to recover additional assets for the benefit of the Estate, communicating with financial institutions, Bingham, and counsel for Joseph to obtain information and records, coordinating with counsel for the SEC, Bingham, and counsel for Joseph on various matters in connection with fulfilling the duties of the Receiver and Receivership Defendants under the Court's Orders.

**B.   Recovering Receivership Defendants' Records and Funds in Various Bank and Brokerage Accounts**

Upon his appointment, the Receiver took necessary steps to begin securing and taking possession of the assets of the Receivership Defendants as authorized by the Receivership Order. *See* Receivership Order at ¶ 7. Immediately thereafter, the Receiver issued demand letters and copies of the Receivership Order to numerous financial institutions, vendors, and other service providers with which the Receivership Defendants had dealings during the time period relevant to the SEC's Complaint, requesting the freezing and turnover of accounts and the production of records. To date, the Receiver has sent approximately 30 letters, providing each recipient with a copy of the Receivership Order and demanding the freezing of all accounts and assets, turnover of control and ownership of the accounts to the Receiver, direction of future correspondence regarding the accounts to the Receiver, and records concerning each account, including statements and communications with the defendants.

There were approximately 38 Bank of America accounts in the name of either the Receivership Defendants or Bingham and Joseph that were frozen in accordance with the Asset Freeze Order. The Receiver immediately contacted Bank of America to obtain bank statements and liquidate the accounts and was able to recover $59,754.65 for the Receivership Estate.[1]

The Receiver also identified seven bank accounts with Wells Fargo in the names of Receivership Defendants LW Square Office LLC, 4100 Hospital, Boca Deerfield, and Globe

---

[1] The Receiver opened a depository bank account with City National Bank under "Wells Real Estate Investment, LLC Receivership" ("Wells Receivership Account"), to deposit funds the Receiver recovers throughout the administration of this case. The Receiver has engaged a bookkeeper to keep track of the funds coming in and out of the Wells Receivership Account and will open any additional trust or escrow accounts to hold funds if doing so may become necessary at a later time.

Property, and one account with Chase in the name of Cambridge Investment Acquisition Group, Inc., which were frozen in accordance with the Asset Freeze Order. The Wells Fargo accounts had less than $1.00 cumulatively, and the Chase account had a balance of $2,165. Both the Wells Fargo and Chase bank accounts have been closed, liquidated, and the funds in said accounts have been deposited into the Receivership bank account.

There were three Merrill Lynch accounts that were frozen in accordance with the Asset Freeze Order. Two of these accounts were Wealth Management accounts. One wealth Management Account was in the name of LW Square Office, LLC, and the other wealth management account was in the name of Wells Real Estate Investment LLC. The LW Square Office, LLC account had a closing balance of $0.00, and the Wells Real Estate Investment LLC account had a closing balance of $923.22. The accounts were closed out on July 31, 2024, prior to the commencement of the Receivership. The third account was a loan management account opened on behalf of LW Square Office. The account seems to have been used to pay off a loan and has a $0.00 balance.  The account remains frozen in accordance with the Asset Freeze Order.

Additionally, the Receiver sent demand letters with copies of the Receivership Order to several brokerage firms including Interactive Brokers, NinjaTrader, and TruTrade LLC. Of the letters sent to brokerage firms, the Receiver succeeded in identifying accounts with Interactive Brokers and NinjaTrader belonging to several of the Receivership Defendants. As discussed in more detail below, the Receiver's forensic accountants are in possession of documents that Interactive Brokers and NinjaTrader have produced to the Receiver. All Interactive Broker and NinjaTrader accounts have also been frozen in accordance with the Asset Freeze Order.

Moreover, the Receiver sent a demand letter with a copy of the Receivership Order to Anderson Business Advisors ("Anderson"). Anderson appears as the registered agent for several

of the Receivership Defendants and was involved in setting up the Receivership Defendant entities. Additionally, the Receiver has reason to believe based on communication with Bingham that Anderson did some accounting work for Wells. The Receiver has sent demand letters to Anderson via US Postal Service and Fax and has tried to contact Anderson through telephone and e-mail to no avail. Bingham has expressed she does not have a personal contact at Anderson that she can give to the Receiver. The Receiver and his attorneys are working on a strategy to obtain documents from Anderson and to further investigate Anderson's potential involvement in the scheme alleged in the SEC's Complaint.

At the outset of being appointed, the Receiver suspected that Bingham and Joseph were operating their alleged scheme at 701 South Olive Office, Unit 118, West Palm Beach, Florida 33401, a property previously owned by Receivership Defendant, South Olive. The day immediately after being appointed, the Receiver and his professionals visited the South Olive property to secure laptops, telephones, other electronic devices, records, and to speak with Wells' employees. However, upon arriving, the building manager informed the Receiver's professionals that the South Olive property was foreclosed a few days prior to the Receiver's appointment, and upon information and belief, the South Olive property was cleared by Joseph prior to the foreclosure sale.

On September 4, 2024, the Receiver interviewed Bingham to discuss in more detail Wells' business operations. The Receiver asked Bingham about how the Receivership Defendants' properties were purchased, where Bingham and Joseph obtained funds to purchase the properties, information regarding the corporate structure of the Receivership Defendants, and the trading activity alleged in the SEC's Complaint. At this interview, Bingham agreed to turn over two Wells' laptop devices to the Receiver. The laptops have been imaged by a data analysis

company, FTI Technology, and the Receiver is in the process of obtaining an online interface to

store the imaging. Bingham also agreed to turn over documents to the Receiver at this meeting,

which included a list of investor names, a list of sales agents' names and other identifying

information, corporate documents, and other records related to Wells' operations and the

Receivership Defendants.

Additionally, Bingham turned over account information to access the Paychex.com,

RingCentral, Bill.com, Quickbooks.com, and Box.com (collectively referred to as the

"accounts") files for several of the Receivership Defendants. The Receiver has been able to

access the Box.com files and is working with the other account vendors to access the remaining

accounts, many of which have been disabled or require the Receiver to obtain administrative

permissions to access the accounts. The Receiver anticipates that the information in the accounts

will give the Receiver more insight as to the sales agents who received commissions from

soliciting investors to invest into Wells' program and whether these sales agents were aware of

the alleged fraudulent scheme.

Further, the Receiver has reason to believe information in the accounts will uncover

additional actors, likely linked to Wells, Bingham, and Joseph, which were involved in assisting

defendants with carrying out the alleged scheme. An initial analysis by the Receiver and his

professionals has shed light on other companies, for example, Sanders Family Offices ("SFO"),

that may have been involved in assisting defendants with executing the alleged scheme.

Specifically, it appears based on the records from the accounts and other related documents that

SFO assisted defendants with finding and employing sales agents located across the country.

SFO then prepared "Memorandums of Understandings" ("MOUs") for sales agents to send to

investors for execution when a sale was made. This information, as well as additional

information the Receiver believes may be stored on the accounts, could further shed light on the alleged scheme and tracing investor funds to potentially be recovered.

Moreover, upon his appointment, the Receiver reached out to all of Wells' prior counsels, including Sachs, Sax, Caplan ("Sachs"), Brad Shraiberg ("Shraiberg"), and Richard Jarolem ("Jarolem"). Sachs handled several of the purchase, sales, and financing for Wells' and the other Receivership Defendants' real estate transactions. The Receiver was able to obtain relevant documents reflecting these real estate transactions from Sachs.

Shraiberg represented Wells in preparation for filing for Chapter 11 bankruptcy. Ultimately, the bankruptcy was never filed because the Receivership proceedings commenced. The Receiver requested that Shraiberg turnover all documents as well as communications pertaining to the pending bankruptcy filing, which are now in the Receiver's possession. Additionally, Shraiberg had approximately $72,000.00 in funds representing Wells' retainer for his services. The Receiver negotiated payment of Shraiberg's legal fees and the turnover of $62,127.50, the remainder of the retainer, to the Receivership Estate. These funds have since been transferred to the Wells Receivership bank account.

Jarolem represented Wells in a state court action filed in Palm Beach County by Panorama Capital, Inc., ("Panorama"), which is discussed *infra* in section VI of this report in further detail. Once again, the Receiver requested and obtained records related to the state court action brought against Panorama from Jarolem.

The Receiver also secured the keys to the Cambridge P.O. Box, which according to Bingham is the main P.O. Box address where Wells and the other Receivership Defendants received mail. The Receiver's counsel is working with the United States Postal Service to close the P.O. Box and redirect any mail addressed to the P.O. Box to the Receiver.

### C. Securing Real Properties

#### i.  *Management of Properties*

Upon his appointment, the Receiver immediately contacted Sachs, which as described above, handled the purchases, sales, and financing for several of the Florida properties Bingham and Joseph purchased through the Receivership Defendants. The Receiver requested and received any and all documents in Sachs' possession related to the Receivership Defendants' real estate purchases and sales. The Receiver's attorneys quickly initiated an analysis of the Sachs documents and uncovered information pertinent to assisting the Receiver with identifying mortgage lenders, determining financing loan terms such as applicable interest rates, and determining what properties were sold by the Receivership Defendants prior to the Receivership.

The Receiver determined which properties were residential, which properties were commercial, and whether the properties had tenants or were vacant. The Receiver discovered that the properties owned by Receivership Defendants 2295 Corporate, 4050 NW, and 4800 Federal were vacant (the "vacant properties"); that the properties owned by Receivership Defendants 60 Yacht Club, 976 Palm Beach, and 910 Parkside have residential tenants (the "residential properties"); and that the 4100 Hospital Office and LW Square properties have commercial tenants (the "commercial properties").

Additionally, the Receiver uncovered that several of the Receivership Defendants either did not own any property, sold its property prior to the Receivership, or lost its property in foreclosure. [2]

---

[2] The Receivership defendants Wells, 112 South Olive, Cambridge,7483 Valencia, Daybreak, and Globe Offices did not own properties at the initiation of the Receivership. The Receivership Defendants 2082 Paradise, 7352 Valencia, 791 Parkside, and 930 Parkside properties were sold or transferred prior to the initiation of this Receivership. The Receivership Defendants South Olive Office, Boca Deerfield, and Globe Property properties were sold in foreclosure sale prior to the initiation of this Receivership.

### iii.    *The Commercial Properties*

The 4100 Hospital property currently has 18 tenants. Immediately upon being appointed, the Receiver called, emailed, and sent the tenants letters advising them of the Receivership and instructing the tenants to redirect rent payments to the Receivership depository bank account.

The LW Square property has two tenants. On the first floor there is a Bank of America and on the second floor a medical office. Like with the 4100 Hospital Property, the Receiver called, emailed, and sent the two tenants letters advising them of the Receivership and instructing the tenants to redirect rent payments to the Receivership depository bank account. The rent payments for the 4100 Hospital property generate approximately $20,559.91 in monthly income and the LW Square property generates approximately $19,939.43 of monthly income to the Receivership Estate. However, as discussed *infra*, due to the indebtedness of the Receivership Estate, primarily to mortgage lenders, these rent incomes do not result in sufficient cash flow.

Shortly after being appointed, the Receiver visited the commercial properties and met with several of the tenants. The Receiver discovered several issues with the commercial properties, including plumbing, electrical, and other maintenance related issues. The Receiver also spoke to the tenants regarding maintenance of the commercial properties. Several tenants reported that Bingham and Joseph had neglected to keep up with the commercial properties for several months prior to the Receivership. For example, the tenants told the Receiver that the landscapers stopped going to the commercial properties, resulting in severe overgrowth of weeds and bushes. Previously, there was a property manager who handled such maintenance. However, he stopped servicing the properties because Wells defaulted on his payments.

The Receiver has made efforts to manage the commercial properties including: (1) gaining access to all electric, water, trash, and sewer bill payment accounts for the commercial

16

properties; (2) paying off past due electric, water, trash, and sewer bills on the commercial properties; and (3) paying current electric, water, trash, and sewer, bills on the properties. At the time the Receiver took over, all water, electric, waste management, and air conditioning bills were severely delinquent, and the water, electricity and AC were days away from being shut off. The Receiver immediately contacted the necessary vendors to negotiate a payment plan to bring the accounts up to balance and keep the water, electricity, and AC on. Since gaining control of the water, electric, and air conditioning bills, the Receiver has been making timely payments.

The commercial properties also received several city code violations due to lack of landscape maintenance and compilation of trash and litter in the outside parking lot and sidewalk areas. At the time the Receiver took over, the LW Square Property had code violations going back to May 2024 and had a hearing scheduled with the Lauderdale Lakes city commission for September 18, 2024. The Receiver contacted the code enforcement officer and was able to have the hearing postponed giving the Receiver time to bring the property up to code—which the Receiver succeeded in doing, obviating the need for a hearing.

The 4100 Hospital Property was also subject to code violations issued by the city of Plantation. Like the LW Square Property, these violations were primarily due to failure to maintain landscaping on the property. When the Receiver became aware of the violations, the deadline to bring the property up to code was October 12, 2024. The Receiver was able to extend this deadline until November 15, 2024.

The Receiver has since contracted with a landscaper and a janitorial company to address these code violations. The Receiver now has a landscaper going to the commercial properties to maintain the bushes, trees, and other shrubbery on the properties every two weeks.

Prior to the commencement of the Receivership, a janitorial company, IMS Corporation ("IMS") would service the two commercial properties multiple times a week. When the Receiver took over, he discovered IMS had stopped providing its services because it was owed: (1) 1,551.60 for June's cleaning services on the LW Square Property; (2) $1,511.25 for July's cleaning services on the LW Square Property; (3) $1,676.25 for August's cleaning services on the LW Square Property; and (4) $662.00 for August's cleaning services on the 4100 Hospital Property. The Receiver was able to negotiate a payment plan with IMS to cover the past due invoices, and IMS has since fully been paid for their prior work. Additionally, the Receiver has entered into a service agreement with IMS to provide janitorial services to the LW Square property three times a week and to the 4100 hospital property two times a week. IMS' cleaning services includes cleaning the inside common areas of the properties, public bathrooms, public stairwells, offices, and collecting trash and other litter/ debris from the outside surrounding parking lot and sidewalks on the properties.

The Receiver's professionals have also analyzed all the commercial tenant leases and created rent rolls to track each tenant's rent amount, whether each tenant has paid monthly rents as rents become due, and which tenants owe past due rent payments. The Receiver plans to take actions necessary to collect past due rent payments from the commercial properties' tenants and deposit the rent monies into the Receivership Estate.

The Receiver is in the early stages of developing a plan for disposition of the commercial properties that would be most profitable for the Receivership. There are foreclosure proceedings against the commercial properties initiated by the mortgage lender. The Receiver has successfully stayed these foreclosure actions in accordance with the Receivership Order. The Receiver has been in communication with counsel for the mortgage lender on the commercial

properties, who has agreed to provide documents so that the Receiver can investigate whether the mortgage lender was part of the defendants' scheme or a bona fide third party lender. The Receiver has also been in contact with real estate brokers and agents with expertise in selling properties located in the area where the commercial properties are located and has reached out to interested buyers who have inquired about the commercial properties.

### iv.    *The Residential Properties*

The Receiver has also taken possession of residential properties with tenants, located throughout Boca Raton and Broward County, Florida. Like the commercial properties, the Receiver's professionals have developed a rent roll based on the residential tenants' leases and have ascertained each tenant's rent amount, have tracked whether each tenant has paid monthly rents as rents become due, and have tracked which tenants owe past due rent payments. Additionally, the Receiver has contacted and sent the residential tenants letters notifying them of the Receiver's appointment and requesting that the residential tenants redirect rent payments to the Receivership. The Receiver plans to take actions necessary to collect past due and future rent payments from the residential properties' tenants and deposit the rent monies into the Receivership Estate.

Like with the commercial properties, mortgage lenders have also initiated foreclosure proceedings against the residential properties. Homeowners Associations (HOAs") for certain of the residential properties have also either initiated foreclosure proceedings or reached out to the Receiver to collect past due payments. The Receiver has been in communication with the mortgage lenders and HOA creditors for the residential properties. As with the commercial properties, the Receiver has also successfully stayed all foreclosure actions pending over the residential properties. The Receiver is considering options for disposition of the residential

properties. In anticipation to potentially prepare the residential properties for sale, the Receiver has begun searching for qualified real estate brokers and agents with experience and expertise in selling residential properties in the areas where the residential properties are located.

### v.    The Vacant Properties

Receivership Defendants 2295 Corporate, 4050 NW, and 4800 Federal, own properties located throughout Broward and Boca Raton, Florida. The properties are commercial buildings or units, all of which are vacant. The Receiver has been in communication with the mortgage lender for the 2295 Corporate and 4050 NW properties. The mortgages on both the properties are in default and the underlying foreclosure proceedings have been stayed in accordance with the Receivership Order. The mortgage lender has been cooperating with the Receiver and has agreed to turn over documents to the Receiver regarding the mortgages to assist the Receiver in investigating the lender's status as a bona fide third party lender.

The mortgage lender and the condominium association for the 4800 Federal property have both initiated foreclosure proceedings against the property. The Receiver successfully stopped a foreclosure sale of the 4800 Federal property which was set to occur on September 24, 2024, in the action filed by the condominium association. The mortgage lender filed its foreclosure action on September 11, 2024. The Receiver has since been in communication with the condominium association and the mortgage lender in hopes to negotiate a deal as to the disposition of these claims and the property.

### vi.    Oakland Land Property

The Oakland Land property is two lots which are located adjacent to the LW Square Office property. There is a tow truck company on the property that is now paying monthly rent to

the Receivership. The tow truck company generates approximately $5,803 monthly income for the Receivership from the rent payments.

Previous appraisals, online resources, and discussions with professionals in the real estate industry estimate that the Oakland Land property is worth approximately between $2-$4 million dollars. The Receiver's next steps will likely be to get the Oakland Land property appraised and bring on a real estate broker with experience in selling to buyers who purchase land to develop.

### vii.     *The 930 Parkside Property*

The 930 Parkside Property is a $1.9 million dollar home, which was used by Bingham and Joseph as their personal residence. Prior to the commencement of the Receivership, Bingham transferred title of the house from Receivership Defendant 930 Parkside to herself personally. Accordingly, at the outset of the case, the 930 Parkside Property was not part of the Receivership Estate.

On September 24, 2024, representatives from Rivero Mestre, with Bingham and Joseph's permission, visited the 930 Parkside Property to collect two desktops and two laptops from Joseph and certain personal property purchased using investor funds. Upon Rivero Mestre's arrival, it became apparent that there were items purchased with investor funds that could not be easily transported and that Joseph was likely using the home as an office to continue the speculative trading activities that are alleged against him in the Complaint. Accordingly, Rivero Mestre spoke with Bingham and obtained her written consent to turn the 930 Parkside Property over to the Receiver. Additionally, Bingham authorized the Receiver to change the locks on the property. The 930 Parkside Property, along with certain personal items purchased with investor funds, has since been secured by the Receiver.

While at the property, the representatives from Rivero Mestre took inventory of personal items and uncovered that Joseph had a back office located in the home referred to as his "trading room" where it is believed that he, along with others, were continuing to engage in trading activity. However, the office was completely cleared out except for a large server.

Like with the other residential properties, the Receiver is determining the best plan for disposition for the 930 Parkside property. In anticipation of potentially selling the 930 Parkside property, the Receiver has begun searching for qualified real estate brokers and agents with experience and expertise in selling residential properties in Boca Raton, Florida.

### viii.    *The Martinique Property*

The Martinique property is located in Boerne, Texas. The Martinique property was originally purchased by Receivership Defendant Martinique. The Martinique property was subsequently sold to Margaret Sanders. Ms. Sanders works for Sanders Family Offices ("SFO"), a company which the Receiver has reason to believe assisted Bingham and Joseph with onboarding sales agents to solicit investors as part of the scheme alleged in the SEC's Complaint. The Receiver is investigating bringing claims to recover the Martinique property as a possible fraudulent or voidable transfer.

### ix.    *JCB Trent Property*

The JCB Trent Property is a residential home located in 11324 S Trent Dr, South Jordan, UT 84095 (the "JCB Trent Property"). The JCB Trent Property is owned by JCB Trent, LLC, a Utah limited liability company. JCB Trent, LLC, is not one of the Receivership Defendants, and according to documents in the Receiver's possession, Bingham is the sole member with 100% interest in JCB Trent, LLC. Bingham has admitted to the Receiver that the JCB Trent Property

was purchased with investor funds and at the option of the Receiver has agreed to turn the property over to the Receivership.

The Receiver and his attorneys have been in contact with a real estate agent located in Utah who is attempting to sell the JCB Trent Property. Additionally, the Receiver and his attorneys have been in contact with counsel for the mortgage lender for the JCB Trent Property, who has informed the Receiver that the JCB Trent Property is subject to foreclosure. Through the Receiver's communications with counsel for the mortgage lender and his review of relevant loan documents, he has uncovered that the current purchase offer is for less than what is owed to the mortgage lender. As such, the Receiver and his attorneys are working with the mortgage lender to determine whether it's in the Receivership Estate's interest for Bingham to turn the JCB Trent Property over to the Receivership or allow the lender to foreclose on the JCB Trent Property.

### D. Securing Personal Property

The Receiver has also taken possession of certain personal property that Bingham and Joseph purchased with investor funds. Namely, the Receiver has taken possession of: (1) a 2023 Tesla vehicle, (2) two Peter Lik photographs valued together at approximately $56,550.00, (3) a Gemological Institute of America ("GIA") certified diamond ring valued at approximately $18,000-$25,000, (4) Joseph's MacBooks and desktop computers, and (5) furnishings inside the 930 Parkside house, which includes a Restoration Hardware sofa that retails for approximately $10,000.00.

The Receiver is working on obtaining title to the Tesla vehicle so that he can proceed with selling it and depositing the sale proceeds into the Receivership Estate. On October 2, 2024, the Receiver filed an unopposed motion to transfer title of the Tesla vehicle to the Receiver [ECF NO. 67] (the "unopposed motion"). On October 4, 2024, the Court granted the unopposed

motion. [ECF NO. 68]. The Receiver's attorneys went to the local tax collector's office with certified copies of the Receivership Order and the order granting the unopposed motion to transfer title to the Tesla vehicle to the Receivership. However, the tax collector's office was unable to complete the transfer because Wells is not registered to do business in the state of Florida. The Receiver has since submitted the necessary paperwork to the Florida Division of Corporations to register Wells in Florida and is waiting for the Florida Division of Corporations to process the paperwork.  Once this paperwork is processed, the Receivership will obtain title to the Tesla vehicle. In anticipation of obtaining title to the Tesla vehicle, the Receiver has already received online quotes from used vehicle purchasers such as Carvana and Carmax.

The Receiver also contacted Hill Auction Gallery ("Hill Auction") and Palm Beach Modern Auctions ("Modern Auctions") to receive quotes to auction the Peter Lik photography. Hill Auctions has estimated the photographs may sell at auction between $2,000 through $4,000 each, and Modern Auction has estimated the photographs may sell at auction between $1,000 and $2,000 each. Both Hill Auction and Modern Auctions would take a 30% cut of the commissions from the sale. These estimates are based on the purchase receipts for the photographs which include the full dimensions and purchase price of the photographs. Additionally, both Hill Auction and Modern Auctions have expressed these prices are no more than conservative estimates and cannot guarantee that the photographs will sell for the estimated prices given. The Receiver is continuing to get additional proposals for the sale or auction of the Peter Lik photographs.

The Receiver took the diamond ring to be appraised by two professional jewelers located in Miami, Florida. The Receiver received one offer for $19,000.00 and a second offer for

$21,000.00 from the appraisers to purchase the ring. The Receiver sold the ring for $21,000.00 and deposited the funds into the Wells Receivership depository account.

The Receiver plans on imaging the MacBooks and desktops that Joseph turned over. The Receiver is currently working with the SEC to come up with a cost-effective plan for imaging and storing whatever data and other information is obtained from the devices.

As for the furnishings secured in the 930 Parkside home, the Receiver and his professionals are assessing what options will be most profitable to the Receivership Estate. Potential options include listing the furnishings on websites such as estate sale websites or holding an Estate Auction through a certified auctioneer.

## V.      FINANCIAL AFFAIRS

Defendants purportedly raised at least $56 million dollars in investor funds. *See* the Complaint at ¶1. Defendants, personally and through a web of sales agents, told investors that these funds were going to be used to invest in income generating real estate development projects. However, of the $56 million dollars, approximately $11 million dollars were traced to the actual purchase of real estate. *See id.* at ¶3. According to the Complaint, and based on the Receiver's initial investigations, the remaining funds were likely diverted by Bingham and Joseph to engage in speculative trading and to purchase luxury items. *See id.* at ¶72.

### A.  Financial Accounts

The Receivership Entities' financial accounts were frozen in accordance with the Receivership Order. The Receivership Order also provides the Receiver with control and signatory authority for all financial accounts. *See* Receivership Order, ¶¶7,11. The Receiver has taken control of the Receivership Defendants' existing financial accounts and opened new accounts. A list of the financial accounts is attached as **Exhibit B**.

### i.    Receivership Defendants' Bank of America Accounts

Between 2019 through 2023, individual defendants opened over 20 accounts in the name of the Receivership Defendants with Bank of America. These accounts were frozen in accordance with the Asset Freeze Order and the Preliminary Injunction. The Receiver recovered $59,754.65 from the Bank of America accounts and deposited the funds in the Wells Receivership account. The accounts have since been closed by Bank of America.

Bank of America also turned over the bank account statements for the past five years for each account. EisnerAmper is in receipt of these bank account statements and is currently performing forensic accounting work to determine the source of those funds and to identify transfers to third parties that may be recoverable for the benefit of the Estate.

### ii.    Receivership Defendants' Merrill Lynch Accounts

The Receiver identified three Merrill Lynch accounts held by LW Square and Wells. As discussed *supra* in section IV, two of the Merrill Lynch accounts were wealth management accounts and the third was a loan management account. The two wealth management accounts were closed and wiped out in July—likely by Bingham or Joseph—prior to the commencement of the Receivership. The loan management account was being used to pay off a loan and has a $0.00 balance. Accordingly, no funds have been recovered from the Merrill Lynch accounts. The Receiver has obtained statements for three Merrill Lynch Accounts. EisnerAmper is in receipt of the Merrill Lynch accounts' statements and is currently analyzing the records.

### iii.    Receivership Defendants' Chase Account

Defendant Bingham turned over an account to the Receiver she opened at First Republic Bank, now Chase, under the account name Cambridge Real Estate Investment Acquisition Group, Inc. When the SEC filed its Complaint, it was not aware of this Chase bank account and

26

the account was not included as part of the Freeze Order. The Receiver has since frozen the account in accordance with the Receivership Order and Preliminary Injunction and has received all the bank statements for the account. The account has been liquidated and the Receiver recovered $2,165.00 from the account, which has been deposited to the Wells' Receivership account.

Additionally, EisnerAmper is in receipt of the bank account statements and is currently performing forensic accounting work to determine the source of the funds and where the funds were transferred.

### iv.    Receivership Defendants' Wells Fargo Accounts

There were 7 bank accounts opened at Wells Fargo for Receivership Defendants LW Square Office LLC, 4100 Hospital, Boca Deerfield, and Globe Property. The Wells Fargo accounts were frozen in accordance with the Asset Freeze Order and have remained frozen in accordance with the Preliminary Injunction. The Receiver has since obtained the bank account statements for these accounts and has proceeded with liquidating and closing out the accounts. Based on the statements, these accounts were opened in 2023, and Bingham has expressed in communications with the Receiver's counsel at Rivero Mestre that these accounts were primarily used to conduct business for Receivership Defendant, Boca Deerfield. When the Receiver took possession of the Wells Fargo accounts there was less than $1.00 in funds cumulatively.

EisnerAmper is in receipt of the bank account statements and is currently performing forensic accounting work to determine the source of the funds in the accounts and where the funds were transferred.

###### v.    *Receivership Defendants' Brokerage Accounts*

The Receiver has uncovered three brokerage accounts held at NinjaTrader opened under

LW Square, 60 Yacht Club, and Wells, and seven brokerage accounts held at Interactive Brokers

opened under 60 Yacht Club, 1070 Boca, 4800 Federal, Cambridge, Globe Offices, LW Square,

and Wells. Both NinjaTrader and Interactive Brokers are online trading platforms, primarily

utilized by users to trade futures, options, and other stock funds. These accounts have been

frozen in accordance with the Asset Freeze Order and the Preliminary Injunction, and the

Receiver has obtained statements for these accounts. Additionally, Interactive Brokers turned

over the metadata underlying the transactions reflected in the account statements and has agreed

to turn over additional documents reflecting its contracts with the Receivership Defendant owned

accounts.

The SEC alleges Bingham and Joseph diverted at least $28 million dollars in investor

funds to engage in speculative trading. The Receiver's professionals' initial review of the

brokerage account statements suggests that the majority of these funds were traded through the

Interactive Brokers platform. EisnerAmper is in receipt of the brokerage account statements as

well as the metadata for the Interactive Brokers accounts. So far, EisnerAmper has been able to

trace approximately 90% of the diverted funds to the Interactive Brokers trading activity.

EisnerAmper is continuing to perform forensic accounting work to determine where the

remaining funds went.

### B.  The Receivership Defendants' Business Operations

The timing of the Receivership could not have been worse from a cash flow perspective.

Bingham and Joseph touted Wells as a successful real estate development company with a real

estate portfolio of about $450,000,000. *See* the Complaint at ¶37. Bingham and Joseph, together

28

with their network of commissioned sales agents, pitched this fabricated Wells' portfolios to solicit investor funds. *Id.* at ¶39. Bingham and Joseph in turn used the investor funds to, among other things, engage in speculative trading, purchase personal property, purchase luxury items, and pay undisclosed commissions to their sales agents. Bingham and Joseph used $28 million of the $56 million investor funds to engage in speculative trading at a loss of approximately $12 million. Additionally, it seems only $11 million dollars of investor funds was used to purchase real properties. *Id.* at ¶3.

These properties were purchased and managed through the Receivership Defendant entities. However, the properties failed to generate any significant income. The Receiver's review of relevant documents showed that the properties were financed primarily by hard money lenders, with some mortgage notes providing financing in the millions at high interest rates. Some properties were also refinanced, further indebting the Receivership Estate. What's more, several mortgage lenders had already initiated foreclosure proceedings prior to the Receiver's involvement, and based on those actions alone there is approximately more than $20 million dollars owed in mortgages and other lending for the properties. *See also id.* at ¶53. In addition, prior to the commencement of the Receivership, some of the properties were sold at foreclosure sales under market value.

Theoretically, income from business operations would be generated by the rents received from the tenants on the commercial and residential properties discussed *supra* in section III. However, due to the debts owed to lenders as a result of the Receivership Defendants past defaults, the commercial and residential properties are operating at a negative cash flow for the Receivership Estate.

At the time the Receiver took over, the Receivership properties were also severely indebted to vendors and service providers. The properties were at risk of having the water and electricity shut off due to failure to pay bills for several months. For example, when the Receiver took over control of the properties' Florida Power and Electric ("FPL") bill accounts, there was approximately $20,000 in past due money owed to FPL. As a result, the properties were at risk of having the electricity shut off.  The county waste management had also not been paid for several months and as a result stopped collecting trash from the properties resulting in complaints from tenants at the time the Receiver took over. Vendors, such as the landscapers and janitorial staff, stopped servicing the properties because they had not been paid and therefore several of the properties had code violations at the commencement of the Receivership.

Additionally, the vendor who services the air conditioning cooling tower on the LW Square property had not been paid for two months prior to the commencement of the Receivership and was threatening to shut off the air conditioning on the property. Accordingly, the Receiver worked swiftly to get in contact with such creditors to negotiate a plan to pay overdue bills and keep electricity and other maintenance on the properties running. Since taking over, the Receiver has begun to pay back past due water, electricity, and waste management bills on the properties and maintained monthly payments for the same. Further, the Receiver has engaged landscapers and a cleaning company to maintain the properties and ensure the properties are up to county code standards to avoid further code violations.

In an effort to maintain business operations while the Receiver determines the best way to dispose of the Receivership properties, the Receiver has been negotiating with mortgage lenders, collecting rents from tenants, and taking steps to upkeep the properties so as to avoid any further code violations.

## VI.     LITIGATION

### A.  Ongoing Legal Proceedings Involving the Receivership Defendants

The Receivership Defendants entered into loan agreements with hard money mortgage lenders to finance the purchase of the Receivership Properties. Upon reviewing the loan documents, the Receiver has identified at least 12 different mortgage lenders from which the Receivership Defendants borrowed money to purchase properties. These mortgage loans have high interest rates and because of defendants' misuse of investor funds, all loans are in default and have been in default and accruing interest since at least 2023.

Additionally, several of the properties owe past due fees to HOAs or Condominium Associations. As a result, several mortgage lenders and HOA's have initiated foreclosure actions in the Circuit Civil Courts for Broward County and Palm Beach County to collect on their claims (the "foreclosure actions").  A full list of the foreclosure actions is attached to this report as **Exhibit C.** The Receiver has filed notices of appearance and notices of a stay on proceedings in accordance with the Receivership Order in each of the identified foreclosure actions. The Receiver has also succeeded in cancelling two foreclosure sales of Receivership properties that were scheduled prior to the Receiver's appointment. The Receiver has been in communication with counsel representing the mortgage lenders or HOA creditors in each of the foreclosure actions.

At least one service provider, King Intelligence and Security Services, has filed an action against a Receivership Defendant to collect money owed under a contract for services. The Receiver also filed a notice to stay the action in accordance with the Receivership Order. Given the nature of the Receivership, the Receiver anticipates similarly situated contractors and subcontractors may come forward and file actions to collect owed money.

31

Further, the Receiver has reached out to all known mortgage lenders, HOAs, and other creditors regarding the stay on the ancillary state actions pending the resolution of the Receivership. The Receiver hopes to negotiate with these mortgage lenders, HOAs, and other creditors to resolve the claims outside of litigation.

Additionally, there is an action pending in Palm Beach County, which was filed by Panorama against Bingham personally and Receivership Defendants Wells, 1070 Boca, 4100 Hospital, 60 Yacht Club, Globe Property, LW Square, and South Olive Office. *See Panorama Capital, Inc., v. Janalie Bingham, et al.*, Case No. 50-2023-CA-016470-XXXA-MB (the "Panorama case"). According to Panorama's complaint, Wells obtained a mezzanine loan in the amount of $21 million dollars from a group of lenders to finance Wells' pending real estate projects and bolster its real estate portfolio. The mezzanine loan was subsequently increased to $166 million dollars. The lenders' interests in the mezzanine loan were secured by pledged assets, which included transfer of 100% membership interest in the Receivership Defendants.

Panorama allegedly served as the custodian in charge of safeguarding the lenders' interest in the pledged assets pursuant to the mezzanine loan. According to the complaint filed in the Panorama case, under Panorama's agreement with Wells, Wells was also required to pay Panorama a fee for serving as custodian. However, Wells defaulted on its payments to Panorama and Panorama subsequently filed its lawsuit.

By the time the Receiver was appointed, the Panorama case had already been stayed pending arbitration. The Receiver reached out to counsel that was representing the Receivership Defendants in the Panorama lawsuit to discuss the status of the arbitration but was advised that no such arbitration had commenced. Upon further review and investigation of the pleadings filed in the Panorama case, the Receiver has reason to believe that the "lenders" are the investors who

were defrauded by Bingham and Joseph's scheme as alleged in the SEC's Complaint. The Receiver's communications with certain investors uncovered that the investors were told Panorama was acting as custodian to protect their interests, but later Panorama was "fired" by Bingham without explanation. Bingham then expressed to investors that she would be hiring a new custodian to ensure investors were protected, but Bingham took no such action. The Receiver plans to further investigate the relationship between Panorama, the Receivership Defendants, and Bingham and Joseph to determine Panorama's role in the scheme alleged in the SEC's Complaint.

### B.  The Estate's Potential Claims against Third Parties

During the initial days and weeks of the Receivership, much of the Receiver's and his professionals' efforts were spent identifying, securing, and marshalling the Receivership Defendants' funds and other assets that were readily identifiable and recoverable. Throughout this Reporting Period, the Receiver's professionals, including her Forensic Accountant, paid particular attention to all potential sources from which the Receivership Estate could recover funds belonging to the Receivership Defendants, including affiliates, sales agents, and third parties who received funds or other assets traceable to the Receivership Defendants' businesses or investors. The Receiver has already identified a number of persons and entities who received transfers from the Receivership Defendants and will continue to gather evidence of additional transfers for the purposes of developing and bringing claims to recover fraudulent and other avoidable transfers. The Receiver will pursue those claims he believes are meritorious and likely to result in a significant recovery to the Receivership Estate.

### VII.    ADMINISTRATION OF RECEIVERSHIP ESTATE

The Receiver has assembled a team of professionals with experience and skills working on receivership and other similar matters.

**A.  The Receiver and His Professionals**

The Receiver is the founding partner at the law firm Rivero Mestre and has been practicing law for 37 years. The Receiver is a commercial litigator with experience in representing corporations and individuals in intellectual property disputes, antitrust and securities claims, partnership and shareholder controversies and significant white-collar criminal matters. Prior to finding Rivero Mestre, the Receiver was a litigation partner at Greenburg Taurig. The Receiver also has experience in government service as a former federal prosecutor in the Southern District of Florida.

The Receiver is working with a team of attorneys and paralegals at the law firm Rivero Mestre to administer this case. Rivero Mestre has extensive experience in the area of receivership law. Jorge Mestre and Amanda Fernandez have assumed primary responsibility of representing the Receiver in this matter. Mr. Mestre has extensive experience litigating complex financial cases, including banking, accounting, malpractice, and directors, and officers' liability lawsuits. Ms. Fernandez has served as legal counsel for receivers in at least five cases involving the SEC or the Commodity Futures Trading Commission.

The Receiver is also working with forensic accountants at EisnerAmper to administer this case. EisnerAmper has extensive experience in providing forensic accounting services in litigation matters, and performing audits for public, private, and government entities.

Andrew Bernstein has assumed primary responsibility for this matter on behalf of EisnerAmper. Mr. Bernstein is a Managing Director in EisnerAmper's Advisory Group's Financial Advisory Services which includes forensic, litigation and valuation services,

bankruptcy and restructuring, and other consulting services, and he has served as forensic accountant in both state and federal receivership actions.

Adam Karasick is assisting Mr. Bernstein with this matter. Mr. Karasick is one of EisnerAmper's practice leaders in data analytics and business intelligence and has 12 years of experience in applying data analytics as part of many forensic accounting investigations.

### B.  Cash on Hand and Administrative Expenses

The Receiver as of the date of this report holds a total of $235,6180.76 in cash on hand in two fiduciary accounts at City National Bank in Miami, Florida, as follows:

Checking Account: $232,674.53

Money Market Account: $2,506.23 [3]

During the Reporting Period, the Receiver has made disbursements totaling $26,514.42 from the checking account for necessary expenses to preserve and administer the Receivership Estate. Such expenses include electric, water, trash, and sewer bill payments, and other expenses related to the operation of the real properties. Attached here as **Exhibit D** is a detailed statement of the Receivership Estate's Receipts and Disbursements during this Reporting Period.

### C.  Claims

The nature of this Receivership may present the need for multiple claims. Individual investors may have claims for monetary damages because of the total or partial loss of their investments as well as other damages incurred as a result of a loss of their investments. As

---

[3] Bank of America liquidated and transferred to the Receivership Estate all the bank accounts in the name of the individual defendants, JCB Trent, LLC, and the Receivership Defendants. The Receiver segregated the amounts from the bank accounts in the name of the individual defendants and JCB Trent, LLC, in the money market account. Bingham thereafter agreed to transfer the funds in the bank accounts in her name and JCB Trent, LLC, to the Receivership Estate. The Receiver will continue to segregate the remaining funds in the money market account until the Receiver determines that the funds belong to the Receivership Estate.

discussed *supra* in Section V, several creditors, including mortgage lenders and HOA's have already brought claims in state civil court throughout Broward and Palm Beach counties to recover on their claims. The Receiver anticipates that additional creditors, such as vendors and service providers may seek payment for the services provided and labor performed prior to the Receivership. The Receiver foresees developing a claims process to address and verify the various claims. This claims process will be developed over time and submitted to the Court for approval when finalized.

### D. Communications

#### i. *Investor Communications*

The Receiver mailed a letter to all known investors dated September 25, 2024, providing investors with notice of the commencement of the Receivership, the Receiver's contact information, and the link to access the website for the Receivership. The Receiver also established a website to post updates for investors (www.wellsrealestateinvestmentreceivership.com), and an email address for investors to communicate directly with the Receiver with general inquiries (wellsreceiver@riveromestre.com).

The Receiver has posted copies of court filings, correspondence with investors, and other pertinent information on the website. The Receiver will continue to post copies of key filings in this case on the website. The Receiver will also continue to use the website as the primary method of communicating with investors throughout the Receivership.

#### ii. *Communications with Lenders, Creditors, and Other Interested Parties*

Since the inception of the Receivership, the Receiver has been in communication with known creditors, primarily mortgage lenders and HOAs. The Receiver has put all known lenders,

creditors, and similarly interested third parties on notice of this Receivership. Several of the known lenders and creditors are represented by counsel in the foreclosure actions. The day after the Court appointed the Receiver, the Receiver immediately called and sent e-mails to counsel for the lenders in the foreclosure actions and put them on notice of the Receivership, the stay on the ancillary actions in accordance with the Receivership Order, and the Receiver's intent to file a notice of stay in said actions.

As the Receivership has carried on, other creditors, primarily HOAs, have reached out to the Receiver by phone or e-mail. Accordingly, the Receiver has primarily communicated with such creditors through e-mail or telephone.

The Receiver has also taken steps to uncover any creditors of the Receivership that may be unknown. For example, the receiver interviewed Bingham to inquire about other potential creditors and has been in communication with the real estate attorneys who handled the closings for several of the Receivership properties to discuss whether any additional mortgages were taken out against the properties or refinancing occurred with other lenders.

### E.  Recommendations

The Receiver's initial focus has been on securing and maintaining the assets of the Receivership Defendants, tracing the use of the investor funds, communicating with creditors and investors, and developing a plan to create liquidity for the Receivership estate. The Receiver anticipates taking the following actions: (i) continue to operate and maintain the properties until the best course of disposition is determined with the goal of each investor obtaining the highest possible return on their investment; (ii) develop a claims process; (iii) investigating and commencing litigation against creditors and other third parties who may be liable for the perpetration of the fraud alleged in the Complaint; (iv) continue to review transfers of the

investor funds across Receivership Defendant owned bank and brokerage accounts to recover funds which were fraudulently transferred; (v) respond to inquiries from investors, creditors, government officials and interested parties; and (vi) provide updates through the Receivership website.

Dated: October 30, 2024

                                        Respectfully submitted,

                                        **RIVERO MESTRE LLP**
                                        *Receiver for the Receivership Defendants*
                                        2525 Ponce de Leon Blvd.
                                        Suite 1000
                                        Miami, Florida 33134
                                        Telephone: (305) 445-2500
                                        Facsimile: (305) 445-2505
                                        E-mail: arivero@riveromestre.com

                                        */s/ Andres Rivero*
                                        Andres Rivero
                                        Fla. Bar. No. 613819

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on October 30, 2024, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being electronically served today on all counsel of record through CM/ECF.

                                        By: */s/ Andres Rivero*
                                            Andres Rivero